**Donna M. DREJZA, Appellant,**

v.

**Michael J. VACCARO, Appellee.**

No. 92–CV–1281.

District of Columbia Court of Appeals.

Argued Feb. 23, 1994.
Decided Aug. 25, 1994.

Patricia D. Douglass, Washington, DC, for appellant.

Donna M. Murasky, Asst. Corp. Counsel, with whom John Payton, Corp. Counsel at the time the brief was filed, and Charles L. Reischel, Deputy Corp. Counsel, Washington, DC, were on the brief, for appellee.

Before TERRY and SCHWELB, Associate Judges, and KERN, Senior Judge.

SCHWELB, Associate Judge:

In this action for intentional and negligent infliction of emotional distress brought by Donna M. Drejza, a rape victim, against Michael J. Vaccaro, the police detective assigned to investigate the rape, the trial judge granted Vaccaro's motion for summary judgment. The principal question presented on appeal is whether, treating Ms. Drejza's account of her dealings with Detective Vaccaro as true and drawing all reasonable inferences from the record in her favor, Vaccaro's conduct while interviewing her shortly after the rape was sufficiently severe and outrageous to entitle Ms. Drejza to a determination by a jury of the question whether she should recover damages for the intentional infliction of emotional distress.

The trial judge found that, if Ms. Drejza's account is credited, Vaccaro's conduct was obnoxious and boorish, but she concluded as a matter of law that it was insufficiently extreme to entitle Ms. Drejza to any relief. On appeal, Ms. Drejza contends that Vaccaro, who knew that she had been raped and traumatized, and that she was therefore in an especially vulnerable condition, abused his

position of authority by deriding, belittling and insulting her, and that under all of the circumstances, Vaccaro's conduct as described by her was sufficiently outrageous to support her claim.

The issue presented to us is a difficult one. Many of the comments by Detective Vaccaro of which Ms. Drejza complains, standing alone, might reasonably be characterized as legitimate (though ill-timed) inquiries by an officer charged with investigating a case and assessing its strength, or as, at most, imprecise and perhaps ill-advised remarks which were insufficient to support a finding of outrageousness. An impartial juror might, on the other hand, reasonably view not only as obnoxious, but also as outrageous, some of Detective Vaccaro's more extreme alleged conduct—*e.g.*, tossing a distraught rape victim's undergarments at her while telling her to take her "little panties home," and later joking and snickering about her lack of virginity, as reflected by her "marital hymen."

A decision in Ms. Drejza's favor may conjure up visions (or specters) of the proverbial slippery slope in an area of the law in which courts have traditionally (and prudently) exercised a measure of restraint. Nevertheless, taking the entire tone and flavor of the encounter into consideration, we conclude that in this case the record, viewed in the light most favorable to Ms. Drejza, raises genuine issues of material fact precluding the entry of summary judgment. Specifically, we conclude that the trial judge, in granting summary judgment in favor of Vaccaro, failed to recognize the significance of the most important fact in the case, namely, that Ms. Drejza's initial interview by a police detective of the "Sex Offense Branch" occurred only an hour or so after she had been raped. An impartial jury could readily conclude that a woman who had been subjected to such a dehumanizing ordeal was far more susceptible to emotional distress than someone in less vulnerable circumstances, and the outrageousness determination must be made with

her special circumstances in mind. Accordingly, we reverse the judgment as to the claim of intentional infliction of emotional distress and remand the case for further proceedings consistent with this opinion.

## I.

## THE FACTS

In the early morning hours of May 16, 1987, Ms. Drejza was assaulted, raped and sodomized in her apartment by Jeffrey D. Smith, a former boyfriend with whom she had terminated a romantic relationship a few months earlier, but with whom she had remained friendly. Although Ms. Drejza voluntarily admitted Smith to her home, the encounter became a violent one. Protesting that Ms. Drejza had "dumped" him, Smith initially requested her to have sex with him. When Ms. Drejza declined his advances, Smith forcibly subdued her. He ripped off her clothes, struck her about the face and back, smashed her face into a pillow, and choked her. Smith forced his penis into Ms. Drejza's mouth and vagina, and he threatened to hit, kick or kill her if she resisted. At times, Ms. Drejza was unable to breathe. She suffered bruises, swellings, and broken blood vessels around her eyes. Smith's hands also left marks around her neck, and she had an assortment of other pains and injuries.[1]

Shortly after Smith left her apartment,[2] Ms. Drejza called 911 to report the rape. Uniformed officers arrived on the scene and took her to police headquarters, where her case was assigned to Detective Vaccaro, then a member of the Metropolitan Police Department's Sex Offense Branch. Vaccaro interviewed her at some length and, according to Ms. Drejza, ridiculed and bullied her into signing a statement to the effect that she did not wish to press charges. It was Detective Vaccaro's conduct during the course of this encounter, and at a second meeting twelve

---

1. Smith was indicted for rape and sodomy, entered a plea of guilty to sodomy, and was sentenced to serve a term of incarceration.

2. After the rape, Smith apologized for "fucking up." As he was leaving, he said he was going to kill himself. Ms. Drejza immediately attempted

to telephone Smith's father to advise him of the rape and of Smith's suicide threat. She was unable to reach the father but related the news to the boyfriend of Smith's sister. Ms. Drejza then called the police.

days later (when Ms. Drejza returned to press charges), that forms the basis for Ms. Drejza's claim against Vaccaro.

According to Ms. Drejza's complaint, on which she elaborated in her deposition, Detective Vaccaro "showed little interest in [her] story or in taking a detailed statement from her, and instead suggested that she simply forget about the incident." During the course of the interview, Vaccaro allegedly asked questions and made comments along the lines indicated in the accompanying footnote.[3] For the reasons stated below, we do not view most of these statements, standing alone, as constituting tortious conduct supporting recovery for intentional infliction of emotional distress.

The specific words used by Detective Vaccaro, however, may be less significant than his manner and tone towards Ms. Drejza as the distraught and shaken young woman attempted to tell the story of her ordeal. Ms. Drejza testified that Vaccaro acted in an obnoxious manner throughout the interview, snickered at her account, and generally treated her with derision and scorn, apparently because her assailant was someone she knew and because she had had voluntary sexual relations with him in the past. According to Ms. Drejza, Vaccaro was "smiling during the whole thing," acting "like he enjoyed it." He had a "smirk on his face when I was telling him about what was going on, like he was enjoying it." Although she had brought her torn underwear and brassiere to police headquarters with her, as she had been instructed to do, Vaccaro declined to accept them, telling her to "take your little panties home with you" and "just tossing it back at me." Ms. Drejza then testified as follows:

> He was just a real jerk about it. I don't think he should have been smiling during this whole thing, like getting enjoyment from it.

> \* \* \* \* \* \*

> He kind of thought it was, oh, a little fight between boyfriend and girlfriend, even though it wasn't that way at all. I don't know whether he is used to seeing women with bruises on their faces.

> \* \* \* \* \* \*

> So he made it sound like it's just going to be awful if I want to pursue this. I should just go home and forget about it. After all, I already had sex with him before.[4] What difference does it make, was his attitude.

Through these and other remarks and actions, Vaccaro made Ms. Drejza "feel guilty about it, like it wasn't really that bad, or you're not really worth it." At the conclusion of the interview, allegedly as a result of the pressure put on her by Detective Vaccaro, Ms. Drejza signed a statement to the effect that she did not wish to prosecute.

Ms. Drejza testified that when she returned twelve days later to press charges, Detective Vaccaro's attitude was essentially unchanged. Upon learning that Ms. Vaccaro wished to pursue the case, he commented that "you now want to file a report and send that guy to jail for life." He also joked and snickered at a reference in a medical report

---

**3.**   1) "You're going to send your boyfriend to jail for life for this?"

2) "After all, you've already had sex with him."

3) "After all, you invited him in late at night."

4) "You will have to spend the next year of your life in the courtroom."

5) "You're going to be in front of a jury of your peers, which in the District of Columbia is all Black. I don't know how they're going to look at you."

6) "You just don't know how rape laws are in the District of Columbia."

7) "You don't want to go to D.C. General. Just go to your private doctor later."

8) "Why don't you just forget about it and go home to sleep. We've got this all written down in case he ever tries it again."

9) Vaccaro told Plaintiff that he would track Smith down to "scare him."

10) Finally, Vaccaro told Plaintiff that Defendant Smith had been "pulled in" by the police that night and that Defendant Smith's sister had told him that Smith was a manic depressive and had not been taking his medication.

**4.**   At one point, Ms. Drejza testified that Detective Vaccaro "made me look like some kind of slut for having sex before I'm married." The context of this remark, though, suggests that the Detective was discussing the potential reaction of a District of Columbia jury to her case.

to Ms. Drejza's "marital hymen," remarking that this "means you are not a virgin." On this occasion, Ms. Drejza complained to the lieutenant in charge, and another detective was assigned to her case.

Vaccaro also testified on deposition. He stated that, from the beginning of the initial interview, Ms. Drejza stated that she did not wish to press charges, but only wanted Smith to receive psychological treatment.[5] He denied attempting to influence her in any way regarding the decision whether or not to prosecute. Although Detective Vaccaro acknowledged that he may have made parts of some of the comments described in footnote 3, *supra*, he insisted that he was simply posing legitimate inquiries and that the decision at the time of the initial interview not to seek prosecution of Smith was entirely Ms. Drejza's.

## II.

### THE TRIAL COURT PROCEEDINGS

On May 16, 1988, Ms. Drejza instituted the present action against Vaccaro and two other defendants.[6] She alleged in her complaint, *inter alia*, that "the actions of Defendants Smith and Vaccaro described above constitute extreme and outrageous conduct which intentionally, recklessly or negligently caused Plaintiff severe emotional distress."

Vaccaro filed a motion to dismiss the complaint against him on the ground that "plaintiff has failed to allege in her pleadings, the tort of intentional infliction of emotional distress, as a matter of law." Judge Wolf denied the motion. Vaccaro then filed a motion for reconsideration or, in the alternative, for

summary judgment, adding a number of grounds not material here. With Judge Wolf's agreement, the motion was presented to Judge Long, to whom Judge Wolf's calendar had been assigned.

In a comprehensive opinion in which she rejected certain other claims raised by Detective Vaccaro,[7] Judge Long concluded as a matter of law that his conduct was not sufficiently outrageous in character to support an action for the intentional infliction of emotional distress. The judge analyzed the issue as follows:

> Certainly, there are tactful and untactful means of broaching these topics with a person who has freshly arrived from a crime scene. But the law does not afford a cause of action for bad taste, boorishness, condescension, obnoxiousness, or social ineptitude. Even if Vaccaro's interview technique resulted in all of these things, they are not tantamount to a specific intent[8] to create psychological injury to the plaintiff.

The judge also noted Ms. Drejza's claim that, as a rape victim, she was peculiarly susceptible to emotional distress. The judge rejected this contention, however, for the following reasons:

> It is worthwhile to remember that any rape victim is presumably upset about what has happened to her. But without any knowledge of any pre-existing, special psychological proclivities or diagnosed problems, there was no reason for Vaccaro to place Ms. Drejza in a category that was different from all other crime victims or all other rape victims. Moreover, the fact

---

5. During the course of her examination of Detective Vaccaro, Ms. Drejza's counsel questioned the plausibility of Vaccaro's account that Ms. Drejza came down to the police station with her torn garments solely in order to ensure that Smith received the necessary treatment. Vaccaro testified that there was nothing that he could do to provide such treatment, but acknowledged that he did not inform Ms. Drejza of this. Vaccaro also asserted that Ms. Drejza initially refused to answer questions regarding her acquaintance and prior sexual relations with Smith. If, from the beginning, Ms. Drejza had indicated that she was unwilling to prosecute, it is difficult to understand why these questions were necessary or relevant.

6. The other defendants were Jeffrey M. Smith (the rapist) and Smith's former employer. The issues relating to these codefendants have no relevance to this appeal.

7. Vaccaro unsuccessfully invoked absolute immunity and qualified immunity.

8. Contrary to the judge's impression, specific intent is not required; reckless infliction of emotional distress is sufficient. See Part III. B. of this opinion, *infra*.

that plaintiff was a rape victim, without more, does not conclusively demonstrate that she was *ipso facto* more mentally unstable than another person who has been involved in a violent event.

The judge thus apparently took the position that if a rape victim has been traumatized as a result of her ordeal, this is of little or no legal consequence unless she has been *more* traumatized than other women who have been subjected to a similar experience.[9]

The judge certified the award of summary judgment in Vaccaro's favor as a final appealable judgment pursuant to Super.Ct.Civ.R. 54(b). This appeal followed.

## III.

## LEGAL DISCUSSION

### A. *The Standard of Review.*

In order to be entitled to summary judgment, Vaccaro must demonstrate that there was no genuine issue of material fact and that he was entitled to judgment as a matter of law. Super.Ct.Civ.R. 56(c); *Clyburn v. 1411 K Street Ltd. Partnership,* 628 A.2d 1015, 1017 (D.C.1993). The record must be viewed in the light most favorable to the party opposing the motion, here Ms. Drejza. *Graff v. Malawer,* 592 A.2d 1038, 1040 (D.C.1991). On appeal from an award of summary judgment, this court conducts an independent review of the record, but the substantive standard is the same as that utilized by the trial court. *Northbrook Ins. Co. v. United Servs. Auto. Ass'n,* 626 A.2d 915, 917 (D.C.1993).

### B. *The Nature and Elements of the Tort.*

"To succeed on a claim of intentional infliction of emotional distress, a plaintiff must show (1) extreme and outrageous conduct on the part of the defendant which (2)

intentionally or recklessly (3) causes the plaintiff severe emotional distress." *District of Columbia v. Thompson,* 570 A.2d 277, 289–90 (D.C.1990) (citations and internal quotation marks omitted), *vacated on other grounds,* 593 A.2d 621 (D.C.), *cert. denied,* 502 U.S. 942, 112 S.Ct. 380, 116 L.Ed.2d 331 (1991). The dispositive issue in this case is whether Detective Vaccaro's alleged conduct, as described by Ms. Drejza, was sufficiently "extreme or outrageous" or, more precisely, whether an impartial jury could reasonably so view it.

The requirement of outrageousness is not an easy one to meet. *See, e.g., Bown v. Hamilton,* 601 A.2d 1074, 1079 (D.C.1992).[10] "The outrageous and extreme [*vel non* ] nature of the conduct to be examined should not, [however,] be considered in a sterile setting, detached from the milieu in which it took place. The salon of Madame Pompadour is not to be likened to the rough-and-tumble atmosphere of the American oil refinery." *Eddy v. Brown,* 715 P.2d 74, 77 (Okla. 1986) (quoted in W. PAGE KEETON, PROSSER & KEETON ON TORTS § 12, at 62 (Supp.1988 to 5th ed. 1984)).

There were circumstances in the present case which, in our view, were not adequately considered by the trial judge, and which profoundly affect the outrageousness calculus. We refer to Ms. Drejza's emotional state immediately following a dehumanizing sexual assault on her, to Vaccaro's knowledge of her susceptibility, and to the position of authority and trust which Vaccaro occupied during his interaction with Ms. Drejza.

First, Vaccaro was dealing with a woman who was in an extraordinarily vulnerable condition. An hour or so before the first interview, as Vaccaro well knew, Ms. Drejza had endured a violent rape—one of the most

---

9. The judge also dismissed the claim of negligent infliction of emotional distress on the authority, *inter alia,* of *Williams v. Baker,* 572 A.2d 1062, 1064 (D.C.1990) (en banc) and *Jones v. Howard University, Inc.,* 589 A.2d 419 (D.C.1991), noting the lack of evidence of bodily touching or physical injury. Substantially for the reasons stated by the trial judge, we affirm this aspect of her decision.

10. The conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." RESTATEMENT (SECOND) OF TORTS § 46, comment d (1965), quoted in *Bown, supra,* 601 A.2d at 1079.

harrowing ordeals that can befall a woman.[11] "[A]cts which are not generally considered outrageous may become so when the actor knows that the other person is peculiarly susceptible to emotional distress." *Thompson, supra,* 570 A.2d at 291. Conduct which would otherwise constitute no more than rudeness has been held to be outrageous, for example, where the plaintiff was "a distraught mother with an unconscious baby who was totally dependent on [the defendant physician] to diagnose the baby's condition and do something about it." *Rockhill v. Pollard,* 259 Or. 54, 485 P.2d 28, 31 (1971). Under ordinary circumstances, screaming at a plaintiff and ordering her out of one's office would be viewed as uncivil but hardly as outrageous, but this court has upheld a verdict in favor of a patient where the defendant doctor had prescribed Valium for her and was therefore aware of her fragile condition; the victim's special susceptibility to injured feelings was dispositive of the result. *See Anderson v. Prease,* 445 A.2d 612, 613 (D.C. 1982) (per curiam).[12]

The reasoning of cases like *Anderson* and *Rockhill* surely applies with even greater force to Ms. Drejza; to hold otherwise would be to trivialize the dehumanizing consequences of rape. "Rape is a dire experience for women because it implies total loss of self—the woman is a function, not a person. The victim experiences that emptiness from self and society." D. Metzger, *It Is Always the Woman Who is Raped,* 133 Am. J. Psychiatry 4 (1976) (quoted in CAROL H. LEFCOURT, WOMEN AND THE LAW § 10.03(4), at 10–33 (1984)). Moreover, the effects of rape

tend to be compounded and prolonged where, as here, the assailant was a man whom Ms. Drejza trusted, and the traumatic event took place in her own apartment where she had every reason to believe that she was safe. LEFCOURT, *supra,* § 10.03(4), at 10–35.

In the present case, Detective Vaccaro was aware not only that Ms. Drejza had been raped,[13] but also that, as a result of her ordeal, she had probably been severely traumatized.[14] Denying that he had attempted to influence the decision of Ms. Drejza or of any other complainant as to whether or not to press charges, Detective Vaccaro insisted that "we do not *further traumatize* any sexual assault victim to go either way." The detective's volunteered choice of words itself acknowledges the existence of trauma in cases such as Ms. Drejza's.

> The extreme and outrageous character of the conduct may arise from the actor's knowledge that the other is peculiarly susceptible to emotional distress, by reason of some physical or mental condition or peculiarity. The conduct may become heartless, flagrant, and outrageous when the actor proceeds in the face of such knowledge, where it would not be so if he did not know.

RESTATEMENT (SECOND) OF TORTS § 46, comment (f);[15] *see also Boyle v. Wenk,* 378 Mass. 592, 392 N.E.2d 1053, 1056 (1979) ("[t]hough there is no evidence that Wenk knew the precise nature of Mrs. Boyle's physical susceptibility, his knowledge that she had just returned from the hospital put him on notice that she might be more vulnerable to harass-

---

11. But "male rape victims suffer similarly to female victims." CAROL H. LEFCOURT, WOMEN AND THE LAW § 10.03(4), at 10–34 n. 172 (1984).

12. For other cases in which the vulnerable condition of the plaintiff has affected the outrageousness calculus, *see, e.g., Turman v. Central Billing Bureau, Inc.,* 279 Or. 443, 568 P.2d 1382, 1384–86 (1977) (plaintiff partially blind and suffering from glaucoma); *Dawson v. Associates Fin. Servs. Co. of Kansas, Inc.,* 215 Kan. 814, 529 P.2d 104, 113 (1974) (plaintiff suffering from multiple sclerosis).

13. Vaccaro testified that "I believe she was sexually assaulted."

14. Vaccaro described Ms. Drejza's appearance as "distraught and nervous." His deposition testimony also included the following:

Q. Isn't it true that victims of sexual crimes often are traumatized by the experience and need a little encouragement in telling their story publicly?
A. If you say so.
Q. I'm asking you.
A. Yes, ma'am, I think so.

15. The comment goes on to emphasize that major outrage is essential to the tort; and the mere fact that the actor knows that the other will regard the conduct as insulting, or will have [her] feelings hurt, is not enough. *Id.*

ment or verbal abuse").[16] The experience of being raped may reasonably be viewed as bringing about a higher degree of vulnerability than a recent stay in the hospital.

Finally, Vaccaro was a police detective. More important, he was a member of the "Sex Offense Branch." He was the individual to whom Ms. Drejza was taken by other police officers. He was the specialist in sex crimes. He was an official, Ms. Drejza could reasonably suppose, who could be trusted to assist her and investigate her complaint in a professional and helpful manner. If Ms. Drejza's account of her encounter with Detective Vaccaro is credited, as it must be for purposes of summary judgment, then, instead of helping and reassuring her, Vaccaro abused the authority of his office to ridicule, bully, humiliate and insult her. Outrageous conduct may consist of "[the] abuse of [a] position of authority, particularly by, *inter alia*, police officers." *Carter v. District of Columbia*, 254 U.S.App.D.C. 71, 94, 795 F.2d 116, 139 (1986) (citing RESTATEMENT (SECOND) OF TORTS § 46, comment e (1965)).[17]

### C. The Trial Court's Legal Standard.

█ The trial judge took the position that the key question, in relation to Ms. Drejza's vulnerability, was whether she was more susceptible to emotional distress than other rape victims or crime victims, rather than whether she was more susceptible than a member of the public at large. The judge cited no authority for this proposition, and we know

of none. Comment (f) to § 46 of the RESTATEMENT, quoted at page 13, *supra*, speaks in terms of peculiar susceptibility to emotional distress "by reason of some physical or mental condition or peculiarity." Being a rape victim, standing alone, surely constitutes such a physical or mental condition. An impartial trier of fact could reasonably find that any woman who has been raped a short time earlier is thereby rendered peculiarly susceptible to emotional injury alone, without reference to the condition of any other rape victim or crime victim.

Our disagreement with the trial judge is illustrated by reference to cases involving another class of peculiarly susceptible individuals, namely, employees. "[T]he relationship between employer and employee imposes more demanding obligations to refrain from inflicting mental or emotional affronts *than apply between strangers*." *Hall v. May Dept. Stores Co.*, 292 Or. 131, 637 P.2d 126, 131 (1981) (emphasis added); *see also Alcorn v. Anbro Eng'g, Inc.*, 2 Cal.3d 493, 86 Cal. Rptr. 88, 90, 468 P.2d 216, 218 n. 2 (1970). The italicized words are important; an employee is not required to show that he or she is more susceptible to emotional injury than other employees. Rather, the appropriate comparison is with a non-employee, a stranger.

The difference between an employee and a non-employee is surely dwarfed, for purposes of our inquiry, by the difference between someone who has just been raped and some-

---

**16.** If the distress is exaggerated in comparison to that which a reasonable [person] would experience, there is no liability unless the defendant is aware of the plaintiff's peculiar susceptibility to emotional distress. [RESTATEMENT (SECOND) OF TORTS § 46] comments f and j. The plaintiff's peculiar susceptibility to emotional distress thus both broadens and narrows the scope of the tort. It broadens the scope in that a jury may find the defendant's conduct to be outrageous in light of his knowledge of the plaintiff's peculiar susceptibility where it would not be so without such knowledge. *Id.*, comment f. Yet it narrows the scope in that without such knowledge, the defendant is not liable for exaggerated emotional distress. *Id.*, comment j. *Malandris v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*, 703 F.2d 1152, 1159 (10th Cir.1981),

*cert. denied*, 464 U.S. 824, 104 S.Ct. 92, 78 L.Ed.2d 99 (1983).

**17.** Detective Vaccaro's conduct, as described by Ms. Drejza, appears to echo a pattern discerned by students of the subject:

The police also consider the relationship between the parties in arriving at the founding decision. If the parties are total strangers, police skepticism is reduced. When, however, the woman knows her attacker, no matter how superficially, the police may be reluctant to believe the intercourse at issue was not consensual; the assumption is that a man known by the victim must be her boyfriend.... Rape by a body recognizable to the woman is Love.

Sally Gold & Martha Wyatt, *The Rape System: Old Roles and New Times*, 27 CATH.U.L.REV. 695, 710 (1977) (footnote, citations and internal quotation marks omitted).

one who has not. Accordingly, we are compelled to reject the trial judge's "susceptibility" standard as articulated in her opinion.

## D. Application of the Law to the Facts.

Applying the foregoing legal principles to the record before us, we conclude that Ms. Drejza has raised genuine issues of material fact precluding the entry of summary judgment. We do so in spite of our disagreement with some of her individual contentions.

When Ms. Drejza was brought to the Sex Offense Branch within an hour or so of the rape, it was Detective Vaccaro's responsibility to investigate the facts. If Ms. Drejza decided to press charges, the police and prosecutors would eventually have to assess, *inter alia*, the strength of the case against Smith and the probability that Ms. Drejza would continue to pursue it.[18]

The situation confronting Vaccaro was aptly described in the brief filed by the Corporation Counsel in his behalf:

Police officers who investigate charges of rape face a difficult task. Often the only witnesses to the underlying events are the complainant and her alleged attacker. Furthermore, when the complaining party identifies a friend or an acquaintance as the perpetrator, the issue of consent may loom large. In such circumstances, police officers must gather sufficient credible evidence to establish probable cause to believe that the friend or acquaintance has committed an unlawful sexual assault on the complainant; they need assurance that the complainant will not later change her

mind about the character of the encounter; and they need to be satisfied that a prosecution may be successful.

In discharging these responsibilities, police officers must ask questions of the person who claims to be a rape victim, questions that would be viewed as innocuous when the crime alleged is not rape, but which may appear to be insensitive or even insulting when the crime alleged is rape.

Given these realities, many of the remarks attributed to Vaccaro in the complaint, if made in a respectful tone and at an appropriate time, would be either appropriate or, at least, less than outrageous. Ms. Drejza's prior sexual relationship with Smith, and her readiness to allow her assailant to visit her late at night, would undoubtedly be raised by the defense if the case were to go to trial. Some complainants might well be reluctant to proceed under these circumstances. A calm and candid discussion of such problems with Ms. Drejza, at least at some point in the investigation, would eventually be necessary and appropriate.[19] Such a discussion should occur, however, after the victim has had time to begin to come to grips with the emotional trauma of being raped, rather than an hour or so after the crime.

Ms. Drejza's first act after the rape was to try to telephone her assailant's father in order to advise him of his son's suicide threat, as well as of the rape. Ms. Drejza was obviously somewhat concerned about Smith and, again assuming a calm and objective tone, it would not have been outrageous for Detective Vaccaro to bring to Ms. Drejza's attention the possible delays in the jus-

18. In situations such as this one, as in life generally, timing can be everything. As a matter of common sense, an interview with a distraught rape victim an hour or so after her ordeal ended was hardly the occasion for a detective of the Sex Offense Branch to question her like a defense attorney or a prosecutor, to try to assess her ability to withstand potential humiliating aspects of a criminal trial, or to challenge her intention to press charges. Such an inquiry could be conducted at a later date, preferably by a prosecutor, after the victim had been given a reasonable amount of time to regain control over her emotions and faculties. After all, Ms. Drejza was at the police station in the immediate aftermath of her rape to ensure that the matter would be carefully investigated. It would surely be reasonable for her not to expect to be challenged or

belittled, almost as soon as she arrived, by the very authorities whose assistance she was requesting.

19. The tone of Vaccaro's alleged remarks on this subject could, of course, make a considerable difference. The question whether "you're going to send your boyfriend to jail for life for this," for example, could become a great deal more derisive and offensive if emphasis is placed on the words *"for this."* Telling a rape victim to go to bed and "forget about it" because her assailant could be apprehended if he did it again is distressingly condescending at best and could, in our view, be quite outrageous if a derisive tone is added to the equation.

tice system, the time she might have to spend in court, or the perceived risk of what he apparently regarded as a potentially unsympathetic all-black jury.[20] These facts, if fairly presented at an appropriate time, were potentially relevant to the decision that Ms. Drejza had to make. Vaccaro's alleged remarks enumerated in footnote 3, when divorced from the time and tone of the encounter, were at least arguably insufficient as a matter of law to support a claim of intentional infliction of emotional distress.

The words used by Detective Vaccaro cannot, however, be considered in a vacuum. As the trial judge recognized, "[t]he fundamental tone of the investigative interview is obviously disputed." If Ms. Drejza's account of her dealings with Detective Vaccaro is accurate, then the comments of which she complains were made by a man who had become contemptuous of her claim of rape because the assailant was a former boyfriend who was alone with her in her apartment in the early hours of the morning, and Vaccaro allowed his contempt to show. According to Ms. Drejza, Vaccaro continuously laughed at her, snickered whenever prior sexual activity on her part came up in the discussion, treated her with derision, and bullied her into initially declining to press charges. At the conclusion of the first interview, which took place an hour or so after the rape, Vaccaro allegedly tossed her undergarments at her, telling her to take her "little panties" home with her. Twelve days later,[21] after commenting that Ms. Drejza was now going to try to have her boyfriend jailed for life, Vaccaro allegedly joked about Ms. Drejza's "marital hymen" and laughed at her because she was not a virgin.

Vaccaro does not contend that his conduct, as described by Ms. Drejza, was appropriate.[22] In their brief in this court, Vaccaro's "counsel concede that Ms. Drejza's allega-

tions and testimony would permit a jury to conclude that Detective Vaccaro was insensitive to Ms. Drejza *and even obnoxious.*" (Emphasis added). Vaccaro himself testified that "if [Ms. Drejza's allegations] were proven, yes, I would be certainly disciplined." The question is whether, given Ms. Drejza's susceptibility, an impartial trier of fact could find that Vaccaro's obnoxiousness crossed the line to outrageousness.

The respective roles of the court and jury in this regard are set forth in the Restatement:

> *Court and jury.* It is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery, or whether it is necessarily so. Where reasonable [persons] may differ, it is for the jury, subject to the control of the court, to determine whether, in the particular case, the conduct has been sufficient extreme and outrageous to result in liability.

RESTATEMENT (SECOND) OF TORTS § 46, comment h (1965). The threshold decision by the trial court is quintessentially one of law, and we review it *de novo.* If reasonable people may differ as to whether, given Ms. Drejza's condition and circumstances, Vaccaro's conduct was outrageous as well as obnoxious, the issue must be left to the jury.

In *Boyle v. Wenk, supra,* 378 Mass. 592, 392 N.E.2d 1053, Wenk, a private investigator seeking information about Mrs. Boyle's brother-in-law, harassed Mrs. Boyle and treated her rudely, knowing that she had just returned from the hospital and that she was thus particularly susceptible to infliction of emotional distress. Wenk contended, as Vaccaro claims here, that his conduct, while "rude and clumsy," was not "extreme or outrageous." Rejecting his contention, the court affirmed a judgment in Mrs. Boyle's

---

20. Detective Vaccaro's alleged reference to race was gratuitous, tasteless, and inappropriate, but we do not think it could reasonably be viewed as an outrageous infliction of emotional distress *vis-a-vis Ms. Drejza.*

21. By the time of the second interview, Ms. Drejza's situation was perhaps not quite as poignant as it has been in the immediate aftermath of the rape, but an impartial jury could reasonably find

that she nevertheless remained extremely vulnerable, particularly if Detective Vaccaro's approach rekindled the allegedly humiliating atmosphere of the initial interview.

22. As we have previously noted, however, Vaccaro has denied under oath Ms. Drejza's principal allegations.

favor, holding that "[i]t is for the jury in such instances to decide whether Wenk's conduct was 'rude and clumsy' or 'extreme and outrageous.'" *Id.* 392 N.E.2d at 1056. *See also LaBrier v. Anheuser Ford, Inc.,* 612 S.W.2d 790, 793–94 (Mo.App.1981); *Meiter v. Cavanaugh,* 40 Colo.App. 454, 580 P.2d 399, 401 (1978); 4 STUART M. SPEISER, *et al.,* THE AMERICAN LAW OF TORTS § 16.14, at 1032–38 (1987) (collecting authorities). We reach the same conclusion in this case. As in *Meiter,* 580 P.2d at 401, "the conduct here [alleged] lies so near the bounds of indecency that the question ... whether it is actionably outrageous [is] properly left to the jury."

## IV.

## CONCLUSION

Cases in which judges and juries must make nice judgments about the outrageousness (or lack thereof) of a defendant's conduct are intensely fact-bound. Accordingly, our holding in this case is necessarily a limited one. We repeat our recent observation that

> [c]ourts do not, or at least should not, issue generalized edicts, nor should they promulgate statute-like rules of law applicable to all future cases, regardless of their facts. Rather, they decide concrete controversies. We do not purport in this opinion to instruct trial judges how to rule on facts substantially different from those here. *See, e.g., Khiem v. United States,* 612 A.2d 160, 1264 (D.C.1992), *cert. denied,* — U.S. ——, 113 S.Ct. 1293, 122 L.Ed.2d 684 (1993).

*Mims v. Mims,* 635 A.2d 320, 325 n. 12 (D.C.1993).

"[P]laintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind." *Meiter, supra,* 580 P.2d at 401 (citing Prosser, *Insult and Outrage,* 44 Cal.L.Rev. 40 (1956)). There is no blanket exemption from this principle even for victims of crime, although the vulnerability of such a victim may be affected by his or her experience, depending on the nature and circumstances of the offense. A showing of outrageousness has always been required, and remains an element of the plaintiff's case today.

But the relationship between the parties, and the susceptibility of the plaintiff to emotional distress, are important factors in the outrageousness calculus. Evidence in this record tends to show that an experienced detective in the Sex Offense Branch humiliated a distraught rape victim, ridiculed her complaint, and treated her with derision. According to Ms. Drejza, Vaccaro repeatedly smirked at her account, acted as though her ordeal was insignificant and her complaints were unreasonable, bullied her into (initially) not pressing charges, and tossed her "little panties" at her, directing her to take them home with her. When she summoned up the courage to return to police headquarters twelve days later to charge her assailant with rape, Vaccaro allegedly mocked her because her "marital hymen" proved that she was not a virgin. Such alleged conduct, directed at a woman whose world has just been turned upside down as a result of a shattering and dehumanizing experience, was not merely obnoxious and insensitive. It was also extreme and outrageous. At least, an impartial trier of fact could reasonably so find.

The decision of the trial court granting judgment in favor of Detective Vaccaro on the claim of negligent infliction of emotional distress is affirmed. The decision as to Ms. Drejza's claim of intentional infliction of emotional distress is reversed, and the case is remanded for further proceedings consistent with this opinion.

*So ordered.*

TERRY, *Associate Judge,* dissenting:

I strongly disagree with my colleagues' disposition of this case. I think the trial judge was absolutely right when she wrote in her opinion that "the law does not afford a cause of action for bad taste, boorishness, condescension, obnoxiousness, or social ineptitude." Since the record, even when viewed in the light most favorable to Ms. Drejza, establishes no more than that, I cannot join in the majority's decision to reverse the judgment.

I do not disagree with the majority's general summary of the law governing claims for intentional infliction of emotional distress. I part company with my colleagues only over the application of the law to the facts of this case, which in my view do not establish the commission of a tort. Detective Vaccaro's treatment of Ms. Drejza was deplorable, but I do not see how it can be regarded as so "extreme" and "outrageous" as to be "beyond all possible bounds of decency," or "atrocious and utterly intolerable in a civilized community." RESTATEMENT (SECOND) OF TORTS § 46 comment d (1965). That is the standard which Ms. Drejza must meet,[1] and I do not think she has met it. This court in *Jackson v. District of Columbia*, 412 A.2d 948, 956–957 (D.C.1980), relying on the Restatement, affirmed a summary judgment for the District of Columbia on facts showing police misconduct at least as reprehensible as that shown here, perhaps more so. The trial judge, correctly in my view, relied on *Jackson* in rejecting Ms. Drejza's claim. As the judge wrote in her opinion:

> [I]f no tort was committed by the officers in *Jackson*, then no tort was committed by [Detective] Vaccaro. The bulk of the words uttered by Vaccaro were well within the range of predictable issues that a detective might raise, in order to ascertain whether a rape complainant is serious about wanting to go forward, whether she realizes the litigation traumas that await her, and whether she is aware of the tactical weaknesses in the prosecution's case that may not redound to her benefit.

Although Detective Vaccaro could certainly have been more gracious and considerate in choosing his words and in his overall dealings with Ms. Drejza, he would have failed in his duty as a police officer if he had not forcefully brought home to her the pitfalls in pursuing her rape complaint. Police officers, after all, are not social workers, nor should they be expected to think or behave like social workers. The very nature of their work causes them to be skeptical and suspicious when they receive a report of unlawful activity. They should not be obliged, on pain of potential civil liability, to put their skepticism aside while performing their professional duties. I fear that my colleagues are well on the way to creating a new tort of not being nice to a victim of crime.

The majority also seems to be saying that because this case involves a rape victim, Detective Vaccaro should have recognized that she was "peculiarly susceptible to emotional distress," RESTATEMENT, *supra*, § 46 comment f, and therefore should have tempered his remarks accordingly. But I know of no case which says that a rape victim has a legal right to be treated more gently than a victim of any other violent crime, such as kidnapping or armed robbery. Any violent crime is a source of great trauma to its victim, and a person who has just been robbed at gunpoint is likely to be in no better psychological shape than someone who has just been raped. Although I do not deny that rape is unique in many ways and that it is likely to leave permanent psychological scars on its victim, rape is not *legally* unique so as to justify a rule giving rape victims special rights when being interviewed by investigating police officers, rights that other crime victims do not have.

As a matter of common decency, Detective Vaccaro clearly should have treated Ms. Drejza with more respect and kindness. He should not have said much of what he said to her, should not have been smiling (or smirking) as he said it, should not have thrown her panties at her, should not have been, as Ms. Drejza said, "just a real jerk about it." But common decency is a moral, not a legal duty. Detective Vaccaro may be a lout and a boor, or worse, but in my view he is no tortfeasor.

Respectfully but vehemently, I dissent.

---

1. This court has consistently followed the Restatement in assessing claims for intentional infliction of emotional distress. *See, e.g., District of Columbia v. Thompson*, 570 A.2d 277, 289–290 (D.C.1990), *vacated on other grounds*, 593 A.2d 621 (D.C.), *cert. denied*, 502 U.S. 942, 112 S.Ct. 380, 116 L.Ed.2d 331 (1991); *Sere v. Group Hospitalization, Inc.*, 443 A.2d 33, 37 (D.C.), *cert. denied*, 459 U.S. 912, 103 S.Ct. 221, 74 L.Ed.2d 176 (1982); *Waldon v. Covington*, 415 A.2d 1070, 1076–1077 (D.C.1980).