Terry HEDGEPETH, Appellant,

v.

WHITMAN WALKER CLINIC
and Mary Fanning, M.D.,
Appellees.

No. 07–CV–158.

District of Columbia Court of Appeals.

Argued Sept. 11, 2008.
Decided Oct. 1, 2009.

Jonathan C. Dailey, Fairfax, VA, for appellant.

Michael L. Sanders, Baltimore, MD, with whom Karen R. Turner, Bethesda, MD, and Brian J. Nash, Baltimore, MD, were on the brief, for appellees.

Before RUIZ and REID, Associate Judges, and FARRELL, Senior Judge.*

PER CURIAM:

This appeal presents the court with a question we have addressed before, although not in the context of facts as stark as in this case, namely, whether a patient may recover damages for acute emotional distress resulting from a negligent misdiagnosis of Human Immunodeficiency Virus ("HIV"), where the misdiagnosis did not directly place the patient in physical danger.

There is no dispute that appellant, Terry Hedgepeth, never was HIV-positive, and,

* Judge Farrell was an Associate Judge of the court at the time of argument. His status changed to Associate Judge, Retired, on July 1, 2008.

indeed, that laboratory test reports made available to appellees indicated that he was not. Nevertheless, because of a series of errors within Whitman Walker Clinic ("WWC"), appellant was misdiagnosed and misinformed that he was HIV-positive. The Superior Court granted summary judgment against appellant and dismissed his complaint, concluding that it was bound by our precedent requiring that a claimant be exposed to a "zone of physical danger" in order to claim negligent infliction of emotional distress. *See Williams v. Baker,* 572 A.2d 1062, 1064 (D.C.1990) (en banc). Because as a division we are bound by prior decisions of this court, we too must affirm. *See M.A.P v. Ryan,* 285 A.2d 310, 312 (D.C.1971) ("[N]o division of this court will overrule a prior decision of this court[;] . . . such result can only be accomplished by this court en banc.").

## I. Facts and Procedural Background

■ In reviewing the trial court's grant of summary judgment, we must construe the facts in the light most favorable to appellant. *See Burt v. First Am. Bank,* 490 A.2d 182, 185 (D.C.1985). The facts, so viewed, that were presented to the court are that after learning that his girlfriend was being treated for HIV, appellant went to WWC and requested an HIV test on December 13, 2000. At WWC, appellant told an intake worker that he "thought [he] had HIV" because he "found out that [his] girlfriend was HIV-positive."[1] Relying at least in part on appellant's self-report, the intake worker made a notation in his file that he was HIV-positive. Appellant then underwent a

blood test. Blood was drawn at WWC and sent to American Medical Laboratories, Inc. ("AML") for testing. The test administered by AML, an HIV–1/HIV–2 Antibodies ELISA test, was "non-reactive," meaning that appellant was not HIV-positive. WWC admits that because of an erroneous interpretation of the negative test report, a "Client Lab Results" form showed appellant as testing positive for HIV.[2] The Client Lab Results form showing appellant as HIV-positive and the negative AML test results were made available to Dr. Mary Fanning, M.D. at WWC. When Dr. Fanning met with appellant, however, she misinformed appellant that he was HIV-positive, and noted in his patient file that he was HIV-positive, but asymptomatic and with a "normal" viral load.[3]

After telling appellant that he was HIV-positive, WWC filed medical forms that made appellant's treatment at WWC eligible for funding under the Ryan White program. WWC personnel also signed off on an AIDS Drug Assistance Program form to apply for public assistance to pay for HIV medication for appellant. This form indicated that appellant's drug regimen required Combivir and Crixivan. This too was in error, as appellant was never prescribed either one of these drugs by WWC doctors and he never took any HIV medications.

Appellant continued to believe he was HIV-positive for five years, when another blood test revealed he is not positive for HIV. During that time, appellant suffered severe emotional distress. Appellant became depressed, which in turn affected all

---

1. According to appellant, he had been tested two months earlier, in October, and had tested negative for HIV.

2. The "Client Lab Results" form prepared at WWC erroneously reported that appellant underwent a Western Blot test, which was reactive for the presence of HIV. This lab results

sheet, which was prepared in December 2000, became part of appellant's printed and computerized file at WWC.

3. The "viral load," according to Dr. Fanning, "refers to the blood concentration of the virus."

aspects of his life, including his relationship with his twelve-year-old daughter. Appellant's depression (as well as a knee injury) also eventually led him to lose his job as a restaurant manager. Following his misdiagnosis for HIV, appellant began to have suicidal thoughts, and he was committed to psychiatric wards on two occasions, first at George Washington University Hospital in January of 2001, and, later, at Sibley Hospital in 2002.[4] He was prescribed medications for his depression, including Zoloft, Ambien, Trazodone, and Wellbutrin. Despair over the misdiagnosis led appellant to "heavy" use of illegal drugs,[5] to suffer from an eating disorder, and to become isolated from his relatives because of the shame he experienced from being HIV-positive. Appellant also began to have sexual intercourse with a woman he knew to be HIV-positive "[b]ecause [he] was diagnosed with HIV and there was no reason for [him] to live." [6]

In mid–2005, appellant visited a different medical clinic, the Abundant Life Clinic, which ran an ELISA test to confirm his HIV status. The test revealed instead that he was not HIV-positive, and appellant was informed that he was HIV-negative.

## II. Analysis

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Nader v. de Toledano*, 408 A.2d 31, 41 (D.C.1979) (quoting Super. Ct. Civ. R. 56(c)), *cert. denied*, 444 U.S. 1078, 100 S.Ct. 1028, 62 L.Ed.2d 761 (1980). This court's review is *de novo*, and we apply the same standard as the trial court in considering whether a motion for summary judgment should be granted. *See Kuder v. United Nat'l Bank*, 497 A.2d 1105, 1106–07 (D.C.1985) (citing *Wyman v. Roesner*, 439 A.2d 516, 519 (D.C.1981)).

In *Williams v. Baker*, 572 A.2d 1062, 1067 (D.C.1990) (en banc), we abandoned our longstanding rule that negligently inflicted mental distress was compensable only where it resulted from a direct physical impact. We maintained, however, a requirement that there be evidence that the plaintiff was in physical danger before she could recover damages for mental or emotional distress. *Id.* We held that "if the plaintiff was in the zone of physical danger and was caused by defendant's negligence to fear for his or her own safety, the plaintiff may recover for negligent infliction of serious emotional distress...." *Id.*[7]

---

4. Appellant testified that he suffered from depression before he was misdiagnosed as HIV-positive. Because this appeal is from the grant of summary judgment, however, we view the evidence in the light most favorable to appellant, allowing for the possibility that appellant's preexisting depression was exacerbated or prolonged by the HIV misdiagnosis. Dr. Donald B. Vogel, appellant's treating psychiatrist, testified that appellant became "more depressed, had a fairly miserable four years" after the misdiagnosis. According to Dr. Vogel, as of the time of the deposition, when he no longer believed he was HIV-positive, appellant was "doing just fine."

5. Appellant testified that he has struggled with drug use for some time, even prior to the misdiagnosis, but that in December 2000 (when he received the misdiagnosis) he "tried to commit suicide" and "used the cocaine heavily."

6. Appellant testified that he had "protected sex" when having sexual intercourse with this person.

7. In *Williams*, the plaintiff brought a medical malpractice suit against a doctor and a hospital to recover damages on her own behalf and on behalf of her son for emotional injuries resulting from the doctor's alleged negligent

Since *Williams,* we have described the "zone of physical danger" test as a "strict" one and have reiterated that it "is the sole means for assessing a claim for damages for negligently inflicted emotional distress." *Washington v. John T. Rhines Co.,* 646 A.2d 345, 348 (D.C.1994). Moreover, we have insisted on this requirement not only in cases where the claimant has been a bystander, as in *Williams, see Cauman v. George Washington Univ.,* 630 A.2d 1104, 1106–07 (D.C.1993) (parents of child born disabled as a result of doctor's negligence could not recover for emotional distress because parents themselves were never in physical danger); *Washington,* 646 A.2d at 348–51 (widow not within "zone of physical danger" where she alleged that funeral home had mishandled her husband's corpse), but also in cases where claimants had a direct relationship with the negligent actor.[8] *See Jones v. Howard Univ. Inc.,* 589 A.2d 419, 420–21 (D.C.1991) (mother potentially within "zone of physical danger" if she could prove that her physical health, or that of her twins, was threatened as a result of the hospital's failure to determine that she was pregnant before it performed x-rays

on her abdomen as well as surgery to remove her gallbladder); *Sowell v. Hyatt Corp.,* 623 A.2d 1221, 1225–26 (D.C.1993) (plaintiff within "zone of physical danger" where she feared that she had consumed worms after seeing a worm in her food, most of which she had already consumed, and immediately began vomiting); *Drejza v. Vaccaro,* 650 A.2d 1308, 1309–11, 1312 n. 9 (D.C.1994) (rape victim not within "zone of physical danger" where police officer made extreme and outrageous remarks while interviewing her shortly after she was raped but did not pose physical threat); *Jane W. v. President & Dirs. of Georgetown Coll.,* 863 A.2d 821, 828 (D.C. 2004) (holding that "for policy reasons alone" patient not deemed to be within the "zone of physical danger" where she received a notification letter—sent to hundreds of patients—advising that she might have been exposed to contaminated syringes).[9]

▪ Although appellant presented evidence that supports that he suffered genuine and severe emotional distress during the years he believed he was infected with HIV, he was never within a "zone of physi-

---

diagnosis and treatment of the child. *Williams,* 572 A.2d at 1063. Because the mother was not physically endangered as a result of the alleged negligent diagnosis, the court held that she could not recover for her emotional distress. *Id.* at 1073.

8. *Cf. Morgan v. Psychiatric Inst. of Washington,* 692 A.2d 417, 421 (D.C.1997) (noting there was no need to apply the "zone of danger" test, because plaintiff was able to "satisf[y] the required showing of physical injury," in that case, an unconsented sexual touching).

9. The notification letter stated in relevant part:

We are writing you because our records show that you recently underwent an interventional [sic] radiology procedure at Georgetown University Medical Center.

We have recently been informed of unauthorized and inappropriate use of medical equipment that raises the unlikely possibility that some interventional [sic] radiology patients, including yourself, could have been exposed to infectious diseases while receiving medication.

Although we have no evidence that any patient has been exposed, it is possible that during the procedure certain medical equipment may have been used that had previously come into contact with blood or other bodily fluids, thereby raising the possibility of infection. I want to reassure you that the chance of infection in this situation is extremely low.

Even so, we want to take appropriate precautions for our patients. We urge you to call us as soon as possible (ideally within two weeks) to arrange for testing, at no cost to you.... *Jane W.,* 863 A.2d at 824 (alteration in original).

cal danger"—as defined by *Williams* and it progeny—as a result of appellees' HIV misdiagnosis. Because we, as a division, are bound by *Williams*, we conclude, as did the trial court, that even if appellant were otherwise able to prove his case, he cannot recover as a matter of law. As noted, appellant did not take medication and was not otherwise medically treated for the purported HIV-positive condition. Appellant does not argue—nor do we think our cases would support—that the needle pricks he underwent for blood tests satisfy the zone of physical danger requirement that has been enunciated in our cases.

Accordingly, the order of the Superior Court granting summary judgment is hereby

*Affirmed.*

Concurring opinion by Associate Judge RUIZ, at p. 9.

RUIZ, Associate Judge, concurring:

This is a case in which no one disputes that appellant was owed a duty by appellees, and he has presented evidence that as a result of their breach of the standard of care, he suffered severe and verifiable emotional distress. Thus, but for the rule set out in *Williams*, as it has been applied in subsequent cases, appellant would be entitled to present his case to the jury. I write separately because I believe that this case warrants reconsideration by the full court of the applicability of the *Williams* "zone of physical danger" requirement to cases where foreseeable and severe emotional distress is inflicted on a patient as a result of breach of the standard of care. When dealing with common law, as we do here, courts should revisit and reconsider rules when subsequent legal or other developments so warrant.

In abandoning the "impact rule" and adopting the "zone of danger" doctrine in *Williams*, we meant to expand the reach of tort law, recognizing that "[t]he tortfeasor owes a duty of care to all persons who are physically endangered by the tortfeasor's negligent act, regardless of whether actual impact occurs." *Williams*, 572 A.2d at 1067 (citations omitted).[10] In reaching this conclusion, we cited advances in medical research and improved diagnostic techniques that can objectively verify and assess emotional distress such as grief, anxiety and anger, which mitigated the concerns that had led to the requirement that, to recover for emotional distress, a plaintiff must have received an actual physical impact. *See id.* Unwilling to eliminate all limitations, *Williams* held that so long as the plaintiff is in the "zone of physical danger," she may recover for negligent infliction of emotional distress. *See id.*

Appellant presents compelling arguments as to why, just as we held in *Williams* that the requirement of physical impact should not be interposed to defeat otherwise meritorious claims, it is similarly unnecessary to require that a plaintiff be in the "zone of physical danger" as a condition of recovery in certain extreme situations. He points, specifically, to the circumstances of this case, where there was a direct doctor-patient relationship and the emotional harm caused by the negligent misdiagnosis of a potentially life-threatening condition is so severe, and so foreseeable, that it provides assurance that a claim to recover for negligent infliction of emotional distress is genuine, and is unlikely to subject doctors and other healthcare providers to spurious claims.

**10.** Under the "impact rule" then extant in the District of Columbia, in order to state a claim for negligent infliction of emotional distress, the plaintiff needed to prove not only that there had been a physical impact, but that the emotional injury "flow[ed] directly from direct physical injury." *Williams*, 572 A.2d at 1064.

According to appellant, the concerns we expressed in *Williams*—the need to safeguard against fraudulent claims, the difficulty of establishing the nature and extent of emotional distress injury, and the fear of opening the floodgates of litigation, *Williams,* 572 A.2d at 1067, are not present where the emotional injury is as serious and clearly caused by the negligent conduct as can be shown in this case. *See id.* ("[F]ear of opening the gates to a flood of litigation [should not] be determinative of whether the interest in question should be legally protected."). Nor is the policy reason we expressed in *Jane W.,* see discussion at pages 7–8 and note 9, *supra,* a significant factor in a situation where, as here, a medical facility is not acting proactively to protect patients, but rather has so clearly deviated from the standard of care.

Other jurisdictions have noted that there should be an exception to the "zone of physical" danger requirement for cases where there exists "an especial likelihood of genuine and serious mental distress, arising from the special circumstances, which serves as a guarantee that the claim is not spurious." *Johnson v. State,* 37 N.Y.2d 378, 372 N.Y.S.2d 638, 334 N.E.2d 590, 592 (1975) (citation omitted).[11] In *Baker v. Dorfman,* 239 F.3d 415, 422 (2d Cir.2000), the Second Circuit applied the *Johnson* rule to a case where the plaintiff sued to recover for emotional distress resulting from a clinic's negligence in informing him of an erroneous HIV-positive test. And, in some jurisdictions, the "zone of physical danger" requirement is applied only to claimants who are bystanders. *See Corgan v. Muehling,* 143 Ill.2d 296, 158 Ill.Dec. 489, 574 N.E.2d 602, 606 (1991) (noting that "the zone-of-physical-danger rule is patently inapplicable to direct victims"); *Johnson v. Commodore Cruise Lines, Ltd.,* 897 F.Supp. 740, 745 (S.D.N.Y.

1995) ("The 'zone of danger' rule has to do with situations where plaintiff has witnessed or has otherwise been affected by a traumatic injury to a third person.").

This issue can present difficult choices and imprecise line-drawing. But it is an important one. I write separately because I believe that, if asked to do so, this may be an opportune case for the full court to revisit the question.

---

**11.** In *Johnson,* the hospital negligently misinformed kin that a patient, who was very much

alive, had died. *See Johnson,* 372 N.Y.S.2d 638, 334 N.E.2d at 590–92.