Beverly DUNCAN, Appellant,

v.

CHILDREN'S NATIONAL MEDICAL CENTER, Appellee.

No. 96–CV–441.

District of Columbia Court of Appeals.

Argued June 4, 1997.

Decided Nov. 13, 1997.

David A. Branch, Washington, DC, for appellant.*

Joseph R. Damato, with whom Russell H. Gore was on the brief, Washington, DC, for appellee.

Before SCHWELB, FARRELL and RUIZ, Associate Judges.

PER CURIAM.**

Beverly Duncan sued Children's National Medical Center ("CNMC") for wrongful termination based on breach of contract and violation of public policy, and intentional infliction of emotional distress. She appeals from the trial court's dismissal of her com-

* Mr. Branch did not represent Ms. Duncan in the trial court.

** Parts II, III, and IV of this opinion were authored by *Associate Judge* RUIZ; part V was authored by *Associate Judge* FARRELL.

plaint, pursuant to Rule 12(b)(6), for failure to state a claim on which relief could be granted. We affirm.

## I. Facts

As gleaned from Duncan's complaint, the facts are as follows: In December 1992, CNMC attempted to transfer Duncan from her position as Methods Developmental Technologist, a position she had held since September 1989, to the position of Senior Medical Technologist. The latter position required her to train for eight weeks in the Blood Bank, performing clinical applications using equipment that utilized radioisotopes which would expose her to Cesium, a continuous emitter of radiation. Duncan, who was six months pregnant at the time, feared the radiation exposure might be harmful in her condition.

According to the complaint, the CNMC Pregnancy and Radiation Safety Emergency Plan ("Pregnancy and Radiation Plan") is a policy implemented by CNMC that governs the exposure of pregnant employees to radiation. The policy requires CNMC to make pregnant workers exposed to radiation aware of the potential risks of radiation exposure and to take appropriate protective measures. Among other things, the policy requires CNMC to monitor exposure levels on a monthly basis by issuing a radiation monitoring badge to pregnant employees while performing duties in radiation exposure areas. Duncan alleges that CNMC failed to follow its policy by failing to notify her of the potential dangers of the radiation exposure and by further failing to follow its policy concerning the monitoring badge even though she was subjected to direct radiation exposure.[1]

Duncan consulted CNMC's Radiation Safety Officer, who suggested she limit her time in the Blood Bank, and her own personal physician, who, after an investigation into the potential dangers to Duncan's unborn child, wrote to CNMC. Duncan's physician recommended that she be removed from direct or constant exposure to the radiation as a pre-cautionary measure until after delivery. Subsequently, CNMC placed Duncan on administrative leave with pay while it conducted its own investigation into the matter.

Following completion of its internal investigation, CNMC refused Duncan's "numerous requests" for the "findings" and "conclusions" of CNMC's investigation.

As quoted in the complaint, Section E paragraph 3 of the Pregnancy and Radiation Plan provides as follows:

E. Employee Options

With consideration to the above, the pregnant radiation worker will be responsible for making the decision of one of the following options:

1. Worker remains on staff and assumes normal duties. These duties are subject to the above conditions.

2. Worker can request to be transferred to another department within the hospital if available.

3. Worker can apply for a Leave of Absence.

4. Worker may resign her position from the hospital.

Concerned about being exposed to radiation, Duncan refused to work in the Blood Bank and requested that she be transferred to another department. CNMC denied Duncan's transfer request and, instead, requested that Duncan use family or sick leave for the duration of her pregnancy. Duncan "did not elect option three [a leave of absence] because of the financial hardship that would have resulted from being out of work without pay." In response to the repeated requests by her superiors that she take family or sick leave, she told the superiors that her reason for not using the family leave was "because it was only used when the expectant mother was close to delivery, and at the time that the superiors were urging her to take the family leave she was not ready for delivery." During the time that Duncan was at home "because of her refusal to use the family leave," CNMC nevertheless involuntarily

1. Duncan's complaint appears to contradict itself as to the monitoring badge, alleging at one point that no such badge was supplied to her after having earlier alleged that a badge was supplied but only to be checked tri-monthly rather than monthly as the policy required. In either situation, however, the complaint alleges that CNMC failed to follow the Pregnancy and Radiation Plan.

placed her on family leave, and when she had exhausted her family and/or sick leave, it terminated her.

## II. Standard of Review

■■■ A challenge to the sufficiency of a complaint under Rule 12(b)(6) presents questions of law, and thus this court conducts a *de novo* review of the record, construing all facts and inferences in the light most favorable to the plaintiff and taking the complaint's allegations as true. *See Atkins v. Industrial Telecommunications Ass'n,* 660 A.2d 885, 887 (D.C.1995). A complaint is sufficient so long as it "fairly puts the defendant on notice of the claim against [her]." *Nelson v. Covington,* 519 A.2d 177, 178 (D.C. 1986). Accordingly, liberal rules of pleading normally protect a plaintiff from dismissal at the pleading stage when the complaint can be said to state a claim if all inferences are drawn in the plaintiff's favor. *See Bible Way Church of Our Lord Jesus Christ of the Apostolic Faith v. Beards,* 680 A.2d 419, 430 (D.C.1996). A complaint should not be dismissed because the court doubts that a plaintiff will prevail on a claim. *See McBryde v. Amoco Oil Co.,* 404 A.2d 200, 203 (D.C.1979). However, dismissal for failure to state a claim may properly be granted where it "appears beyond doubt that the plaintiff can prove no set of facts in support of [her] claim which would entitle [her] to relief." *See Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957).

## III. Public Policy Claim

■■■ On appeal, Duncan argues that her complaint contains a claim for wrongful discharge in violation of a "public policy of not exposing pregnant women to radiation."[2] The complaint does not identify the source of the asserted public policy. However, because our standard of review requires that we make all inferences in favor of the plaintiff and the complaint refers to a "public policy," we must decide if Duncan has felicitously alleged a public policy exception to the at-will employment doctrine.

■■■ At oral argument, Duncan's counsel identified the source of the public policy alleged here as the District of Columbia Human Rights Act's prohibition against sex-

based discrimination, including pregnancy and childbirth. D.C.Code § 1–2505 (1992). *See Carl v. Children's Hospital,* 702 A.2d 159, 162–163 (D.C.1997) (Terry, J., concurring, joined by Wagner, C. J., Farrell, J., and Ruiz, J.) ("[T]he recognition of any public policy exception to the at-will doctrine must be solidly based on a statute or regulation that reflects the particular public policy to be applied, or (if appropriate) on a constitutional provision concretely applicable to the defendant's conduct."); *cf. id.* at 163 nn. 4–5, *see also id.* at 197 n. 2 (Steadman, J., dissenting, joined by King, J.) (acquiescing in concurring plurality opinion). Yet the Human Rights Act specifically requires that "[w]omen affected by pregnancy, childbirth or related medical conditions shall be treated the same for all employment-related purposes ... as other persons not so affected but similar in their ability or inability to work...." D.C.Code § 1–2505(b). The act does not create a special dispensation for pregnant women, but only requires that they not be discriminated against nor denied any employment opportunity due to pregnancy. This rule is reflected in *International Union, United Auto., etc. v. Johnson Controls,* 499 U.S. 187, 111 S.Ct. 1196, 113 L.Ed.2d 158 (1991), in which the Court held that the employer could not discriminate against fertile female employees who may be exposed to high levels of lead during battery manufacture by refusing to allow them the opportunity to work certain jobs which may be potentially dangerous to a woman's reproductive system or fetus. Instead, the Court noted that:

> [w]ith the PDA [Pregnancy Discrimination Act], Congress made clear that the decision to become pregnant or to work while being either pregnant or capable of becoming pregnant was reserved for each individual woman to make for herself.... Decisions about the welfare of future children must be left to the parents who conceive, bear, support, and raise them rather

---

**2.** Duncan did not make a "public policy" based argument in her opposition to CNMC's motion to dismiss.

than to the employers who hire those parents.

*Id.* at 206, 111 S.Ct. at 1207.[3]

In *Armstrong v. Flowers Hosp.*, 33 F.3d 1308 (11th Cir.1994), the court, applying *Johnson Controls*, reiterated that the decision whether to continue in a particular job rests with the pregnant employee and not the employer, who is "generally prohibited from deciding for a pregnant employee what course of action is best for her." *Id.* at 1316. Instead, "[s]he may choose to continue working, to seek a work situation with less stringent requirements, or leave the workforce. In some cases, these alternatives may, indeed, present a difficult choice." *Id.* at 1315. Duncan was faced with such a difficult choice and chose not to work in the Blood Bank. Duncan has not identified a judicially cognizable public policy that imposes upon CNMC a duty to transfer Duncan to a new position or otherwise to accommodate her concerns. To the extent that Duncan has identified the public policy prohibiting discrimination on the basis of pregnancy, it militates against her cause. Given the foregoing, we hold that Duncan's complaint fails to state a claim that her dismissal for failure to work in the Blood Bank violates public policy.

### IV. Intentional Infliction of Emotional Distress

 Duncan's complaint alleges that CNMC intentionally inflicted emotional distress on Duncan by forcing her to continue to either work in the Blood Bank, where her fetus would be exposed to radiation, or to lose her job. In order "[to] succeed on a claim of intentional infliction of emotional distress, a plaintiff must show (1) extreme and outrageous conduct on the part of the defendant which (2) intentionally or recklessly (3) causes the plaintiff severe emotional distress." *Drejza v. Vaccaro*, 650 A.2d 1308, 1312 (D.C.1994) (citations omitted). There is no general duty of care to avoid causing

mental distress, and liability is not imposed for all conduct which causes mental distress. *See District of Columbia v. Thompson*, 570 A.2d 277, 290 (D.C.1990) (citation omitted), *modified*, 593 A.2d 621 (D.C.1991). Rather, a claim for intentional infliction of emotional distress contemplates acts "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency." *Id.* (citations omitted). The trial court found that the conduct alleged did not rise to the required level of outrageousness as a matter of law. We agree.

 In determining whether the conduct in question is extreme and outrageous as a matter of law, this court considers applicable community standards, the nature of the activity at issue, the relationship between the parties, and the particular environment in which the conduct took place. *See King v. Kidd*, 640 A.2d 656, 668 (D.C.1993). The activity in question in this case is CNMC's administrative staffing decision to transfer Duncan to a new position which required some exposure to radiation while she was pregnant and, subsequently, to terminate Duncan's employment. While our cases recognize that the "extreme and outrageous character of the conduct may arise from the actor's knowledge that the other is peculiarly susceptible to emotional distress, by reason of some physical or mental condition or peculiarity," *Drejza, supra*, 650 A.2d at 1314 (quoting RESTATEMENT (SECOND) OF TORTS § 46 cmt. f (1965)), to the extent that Duncan suffered emotional distress, it was not as a result of any intentional conduct on the part of CNMC. Duncan had a choice not to work in the Blood Bank. Although that choice and its consequences may have been onerous and unappealing to Duncan at the time, CNMC did not force her to remain in a situation where she would be exposed to radiation. Thus, it is difficult to impute intentionality or recklessness to CNMC. Further, our cases show that, generally, employer-employee

---

**3.** The language of the Pregnancy Discrimination Act, 42 U.S.C. § 2000e(k) (1994), is identical to the language of the Human Rights Act quoted above. The latter adds that the prohibition against pregnancy-related discrimination includes "a requirement that an employer must treat an employee temporarily unable to perform

the functions of her job because of her pregnancy-related condition in the same manner as it treats other temporarily disabled employees." D.C.Code § 1–2505(b). Duncan does not argue that she suffered discrimination vis á vis temporarily disabled workers.

conflicts do not rise to the level of outrageous conduct.[4] *See, e.g., Thompson, supra,* 570 A.2d at 290 (D.C.1990) (holding that a pattern of criticism and misrepresentation coupled with an alleged assault of employee and subsequent termination does not constitute outrageous conduct); *Howard Univ. v. Best,* 484 A.2d 958, 986 (D.C.1984) (stating that interference with professional responsibilities does not constitute intentional infliction of emotional distress); *see also Hogan v. Forsyth Country Club Co.,* 79 N.C.App. 483, 340 S.E.2d 116, 123 (1986) (finding that a refusal to grant pregnancy leave or permission to go to hospital and cursing of pregnant employee, while improper, did not constitute outrageous conduct as a matter of law). The facts alleged in the complaint are insufficient to impute recklessness or outrageousness to CNMC in implementing its internal staffing changes. Nor can CNMC's actions be said to go well beyond the bounds of established community standards in the employment relationship. Because the alleged conduct of CNMC underlying Duncan's claim for intentional infliction of emotional distress is not sufficiently "outrageous" as a matter of law to sustain the cause of action, we affirm the trial court's dismissal of Duncan's claim for intentional infliction of emotional distress.

## V. Employment Contract

■ Finally, we reject Duncan's claim of wrongful termination based on alleged breach of an employment agreement. We emphasize at the outset that this is a cause of action *for wrongful termination.* However unclear Duncan's complaint may otherwise be, it is explicit in stating that "[t]his is an action ... to obtain relief from the unlawful · termination from employment." It is *not* a suit for damages, either to Duncan herself or her child then *in utero,* for exposure to radiation while she worked in CNMC's Blood Bank. Thus, whether or not CNMC in fact failed to follow safety precautions governing radiation exposure is not at issue in this case.

There is no dispute that CNMC terminated Duncan's employment. The question is whether she has stated a claim that it did so in violation of written employment policies (specifically the Pregnancy and Radiation Plan) that were or became part of her contract of employment with CNMC. On the latter point—whether the Plan conferred contractual rights on Duncan—we all agree that the case cannot be resolved on a motion to dismiss. So the issue becomes the wrongfulness or not of her termination.

The answer to that question depends squarely on section E of the Plan, which, as recited in the complaint, leaves "the pregnant radiation worker ... responsible for making the decision of one of the following options" when she perceives herself at risk of undue radiation exposure in the job:

1. Worker remains on staff and assumes normal duties. These duties are subject to the above conditions.[5]

2. Worker can request to be transferred to another department within the hospital if available.

3. Worker can apply for a Leave of Absence.

4. Worker may resign her position from the hospital.

If Duncan's complaint fairly alleges that she was given none of the first three options, then she has stated a claim that her termination was wrongful.

Duncan has not stated a claim that she was wrongfully denied a transfer to another department. The Plan is explicit in saying that the worker may *request* such a transfer, which will be honored if a position in another department is *available.* Nothing in the complaint counters the obvious inference that this decision rested within the business judgment of CNMC. Nor does Duncan even allege that the denial of a transfer was unreasonable or arbitrary, in violation of a supposed implicit duty of good faith or fair dealing on CNMC's part.

---

4. This does not suggest that there can never be a claim for intentional infliction of emotional distress arising from an employer-employee relationship.

5. Those "conditions," as alleged, include monitoring radiation exposure records and insuring that the permissible dose of ionizing radiation to which the embryo/fetus is exposed is not exceeded.

On the other hand, Duncan's concession in the complaint that she refused to "remain[ ] on staff [in the Blood Bank] and assume[ ] normal duties" (option 1) is not sufficient, by itself, to defeat her claim. That option is expressly made "subject to the above conditions," see note 5, *supra*, that is, to CNMC's taking the measures stated earlier in the Plan to monitor and control radiation exposure. The complaint alleges that CNMC failed to implement those protections in Duncan's case.

Yet even if Duncan were not satisfied with CNMC's implementation of the safety measures, the Plan did not leave her with no other choice but resignation (the equivalent of termination). Option 3 says that a worker may "apply for a Leave of Absence." The complaint does not say whether the leave permitted was paid or unpaid, although we may assume it was a combination of both (depending on how much sick and annual leave a worker had accumulated). If Duncan refused to request this option, even if it meant leave without pay for a limited period, then CNMC's discharge of her once it determined that no other placement was available and she refused to continue with her "normal duties," would not have been wrongful. Leave without pay would still be employment by CNMC, not termination.

Duncan, however, states expressly in the complaint that she "did not elect option three because of the financial hardship that would have resulted from being out of work without pay." In paragraph 46 she again states that she "declined the endless telephone invitations to use family leave made by her superiors." [6] That is a specific concession that she did not avail herself of option 3. The complaint goes on to allege that she was involuntarily placed on family leave anyway, and that she was discharged after she "had exhausted her family and (or sick leave)." But nowhere does Duncan allege that she requested and was denied a leave of absence that would have permitted her to remain with the employer and return to work after her delivery. She rejected the leave option

out of hand and instead, in the words of her opposition to the motion to dismiss, "attempted to adhere to [CNMC's Plan] by requesting to be transferred to another location until the end of her pregnancy," a request the employer was not obliged to grant.

We must, of course, read the complaint liberally in favor of Duncan for present purposes, but even so there is nothing in the complaint sufficient to overcome her disavowal of having pursued an option available to her if she declined to continue in her present duties.

*Affirmed.*

RUIZ, Associate Judge, dissenting in part:

A majority affirms dismissal of Duncan's claim for wrongful termination based on breach of an employment agreement. I disagree. The complaint, although not a model of clarity, sets out a claim based on breach of an employment contract sufficient to meet the minimal requirements of notice pleading. Further, if the allegations in the complaint and inferences therefrom are construed in the light most favorable to Duncan, as they must be, the complaint states a claim that the Pregnancy and Radiation Plan constituted an agreement between CNMC and Duncan and that Duncan's termination was in breach of CNMC's obligations to Duncan under that employment agreement.

Duncan's wrongful termination count alleges that CNMC failed to adhere to its Pregnancy and Radiation Plan, a copy of which she was provided, that governed situations in which pregnant employees may be exposed to radiation. The complaint quotes from the Plan in a number of places. The complaint alleges that the Plan declared a general policy:

It is the policy of Children's Hospital National Medical Center to *ensure* that all practical measures are taken to *ensure* that the permissible dose of ionizing radiation to the embryo/fetus is not exceeded ruing [sic] the entire period of gestation. Further, it is the policy of CHNMC to·

---

**6.** Although the complaint does not say whether family leave was paid or unpaid if taken separately from accumulated sick or annual leave, it was presumably a species of "Leave of Absence" within the meaning of option 3.

inform female radiation workers of the risks associated with exposrue [sic] to ionizing radiation involved uring [sic] pregnancy and of their options to continue employment.... In addition, the policy should assist the employee by preventing unnecessary conflict or presure [sic] in the prvacy [sic] of the family.

(Emphasis added.)

Pursuant to that policy, the complaint alleges that the Plan requires CNMC to take specific preventive measures:

1. Once the supervisor has received notification of a radiation worker's pregnancy, a pregnancy file will be started. The Radiation Safety Office, along with the individual will review the historical radiation records of the pregnant radiation worker....

. . . .

3. The Radiation Safety Office and the supervisor will closely monitor the monthly radiation exposure records for this individual to insure that they are minimal and that the cumulative exposure stays below 125 mrem during the gestation period.

. . . .

The worker will be issued a TLD monitoring badge to be work [sic] at all times at waist level under the apron, in addition to their regular film badge, during duties performed in direct exposure areas.

The complaint alleges that CNMC "ignored" these safety precautions. Specifically, the complaint alleges that Duncan was not provided with a "badge" to monitor her exposure to radiation and that instead of monthly monitoring of Duncan's radiation exposure, as required, her exposure was to be monitored only in three-month intervals.

The complaint further alleges that under the Pregnancy and Radiation Plan a pregnant employee exposed to radiation "will be responsible for making the decision of one of the following options":

1. Worker remains on staff and assumes normal duties. These duties are subject to the above conditions.

2. Worker can request to be transferred to another department within the hospital if available.

3. Worker can apply for a Leave of Absence.

4. Worker may resign her position from the hospital

According to the complaint, Duncan requested a transfer to another department (the second option), but CNMC "refused to comply with the request." Duncan could not choose the first option, continuing with her normal duties in the Blood Bank, because of the danger and stress caused by "unknown factors regarding the radiation exposure," as a result of the lack of monthly monitoring and CNMC's refusal to inform Duncan of the results of its internal investigation. Duncan's complaint also explains that she did not choose the third option, applying for a leave of absence, because of the financial hardship it would cause her family and because if she had taken leave early in her pregnancy, she would have exceeded her available medical and family leave and been terminated as a result. The complaint alleges that that, indeed, is what occurred when CNMC terminated Duncan once her available leave expired after CNMC had involuntarily placed her on family leave.

An at-will employee may be discharged "at any time and for any reason, or for no reason at all," *Adams v. George W. Cochran & Co.*, 597 A.2d 28, 30 (D.C.1991), "subject, of course, to the caveat that an employer may not discharge an employee for a reason that has been made unlawful by a statute specifically applicable to the employer-employee relationship." *Carl, supra,* 702 A.2d 159, 162 n. 1. The District of Columbia recognizes that an "implied contract may arise from the language of an employee handbook or manual." *Smith v. Union Labor Life Ins. Co.,* 620 A.2d 265, 269 (D.C.1993); *see also, Sisco v. GSA Nat'l Capital Fed. Credit Union,* 689 A.2d 52, 55 (D.C.1997). Interpretation of a contract is a question of law unless it is dependent on extrinsic evidence or the credibility of extrinsic evidence. *See 1010 Potomac Associates v. Grocery Mfrs. of America Inc.,* 485 A.2d 199, 205 (D.C.1984). Concomitantly, a contractual writing "must be interpreted as a whole, giving a reasonable, lawful, and effective meaning to all its terms." *Id.;* RE-

STATEMENT (SECOND) OF CONTRACTS § 202(2) (1981). In the context of an employee policy or handbook, this court looks to "both the terms of the manual and the manner of its distribution" to help interpret it and determine whether the at-will presumption is overcome and a jury issue presented. *Sisco, supra,* 689 A.2d at 55.

The complaint filed in this case provides limited excerpts of the Pregnancy and Radiation Plan and, according to the complaint's wrongful termination count, CNMC "failed to adhere to the terms and conditions of the Pregnancy Policy and Radiation Plan" in dealing with Duncan's concerns over her exposure to radiation while pregnant, and as to her subsequent termination. As the majority recognizes, the excerpts from the Pregnancy and Radiation Plan provided in the complaint are insufficient for this court to conclude, as a matter of law, that the Plan did not create contractual obligations on the part of CNMC to Duncan. Having assumed favorably to Duncan that a contract existed, however, the majority reaches the opposite conclusion with respect to the question whether Duncan's termination was in breach of the alleged agreement. I believe it similarly is impossible to conclude on the basis of the complaint alone that Duncan's termination did not breach the contract, and that, therefore, Duncan's claim should be dismissed. To the contrary, reading the complaint as a whole and drawing all favorable inferences for Duncan, the complaint can be construed as alleging that Duncan's termination was a result of CNMC's breach of its employment contract with Duncan, embodied in the Pregnancy and Radiation Plan, which obliges CNMC "to ensure that the permissible dose of ionizing radiation to the embryo/fetus is not exceeded." CNMC's breach consisted of its failure to monitor Duncan's radiation exposure so as to assure her of the safety of continuing in the Blood Bank and to provide another option that, in the words of the Plan, would "assist [Duncan] by preventing unnecessary conflict or presure [sic] in the prvacy [sic] of the family." CNMC's breach compelled Duncan, after her transfer request was denied, to stay at home in order to avoid exposing herself to unmonitored and apparently unlimited levels of radiation in the Blood Bank to which she had been reassigned. That action, in turn, led to CNMC's decision to terminate Duncan once her family and sick leave had expired.

The majority concludes, on the basis of the limited excerpts in the complaint, that CNMC satisfied whatever contractual obligations it had so long as Duncan was able to exercise *one* of the first three options set out in the Plan (staying on the job, requesting a transfer, or requesting a leave of absence). With respect to the option Duncan chose, transfer to another department, the majority summarily concludes that Duncan got all the contract gave her: a chance to make a request. Because Duncan did not exercise another option, taking a leave of absence, the majority concludes that she cannot claim that CNMC breached the contract. See *ante* at 213.

The majority's interpretation of the contract and its inferences from the allegations in the complaint are flawed in significant respects. First, to conclude that CNMC had to provide only one option to the employee goes against the express Plan language alleged in the complaint that it is the employee who has the "responsibility for making the decision" among the options. That language strongly suggests that it is the employee who is to have a choice among alternative options, and not, as the majority concludes, that CNMC may restrict the employee's options. At a minimum, the language is ambiguous and requires a contextual reading which, in this case, includes the Plan's expressed policy to "ensure" the safety of pregnant workers exposed to radiation. Further, consideration of extrinsic evidence as to how CNMC has interpreted and implemented the Plan may be required before a sound interpretation of the contract can be reached.

Second, the complaint alleges that Duncan exercised the second option and requested a transfer. With respect to that contractual option, the majority concludes that although Duncan had the right to "request," CNMC had no obligation to grant her request. The right to request, of course, is no right at all and hardly the stuff of which contracts are

made. The majority's odd interpretation is reached in a vacuum, without reference to the Plan's broadly-stated policy, without having seen the alleged contract in its entirety, and without any knowledge of how CNMC may have interpreted and implemented its obligations in other situations where employees have requested a transfer. Instead, the majority simply makes the "obvious inference" that the decision whether to transfer Duncan "vested within the business judgment of CNMC." That inference is contrary to our charge to make inferences in favor of Duncan's claim.

Third, the complaint is silent on the reason for CNMC's denial of Duncan's request for transfer, but simply states that CNMC "refused to comply." As the majority acknowledges, the complaint does not state whether CNMC's refusal to grant Duncan's request was for a business reason, no reason or in order to force Duncan out. The majority infers from that silence—again unfavorably to Duncan's claim—that CNMC's refusal must have been for a good-faith business reason.

Finally, the majority's conclusion that Duncan "conceded" that she did not avail herself of the option to take a leave of absence is contradicted by the complaint. Duncan specifically alleges that she did not have enough available sick and family leave to see her through the remainder of her pregnancy. Even though Duncan did not choose to take family or sick leave during her pregnancy, CNMC involuntarily placed her on family leave and, according to the complaint, terminated Duncan once her leave time expired because she was absent without leave. In light of that allegation, the only inference favorable to Duncan is that she would have been similarly terminated if she had requested a leave of absence without having the sick or family leave necessary to cover the entire period. Otherwise, instead of terminating Duncan once her leave was used up, as alleged, CNMC would have involuntarily placed her on unpaid leave, just as it had previously involuntarily placed her on family leave.

CNMC had been put on notice by Duncan's complaint of the nature of her contract-based wrongful termination claim. Construing all inferences in the light most favorable to Duncan and assuming all her allegations to be true, it cannot be said that Duncan could prove no set of facts in support of her claim. It may be that after some discovery and additional submissions, the undisputed facts would support a motion for summary judgment by CNMC. To dismiss the complaint at this preliminary stage, however, is to deprive the plaintiff of an opportunity to prove her claim. I would reverse in part the trial court's dismissal of Duncan's complaint and remand for proceedings to determine whether the Pregnancy and Radiation Plan constitutes an employment contract, and if so, whether CNMC's breach of its obligations to Duncan under that contract resulted in her termination.