**Melba HEASLEY, Plaintiff,**

v.

**D.C. GENERAL HOSPITAL, et al., Defendants.**

**No. CIV.A. 00–1995(ESH).**

United States District Court, District of Columbia.

Jan. 2, 2002.

---

Jay Schiffres, Washington, DC, for Plaintiff.

Stratton C. Strand, U.S. Attorney's Office, Office of Corporation Counsel, Washington, DC, for Defendants.

## MEMORANDUM OPINION

HUVELLE, District Judge.

Before the Court are defendants' motion for summary judgment and plaintiff's opposition thereto. Plaintiff Melba Heasley, a 72–year–old Caucasian woman, alleges that her employer, D.C. General Hospital, failed to accommodate her disability and otherwise discriminated against her on the basis of her disability, age, and race by changing her work responsibilities, ridiculing her, and eventually terminating her employment. Plaintiff has brought suit against the District of Columbia and the District of Columbia Health and Hospitals Public Benefit Corporation asserting that defendants' failure to accommodate her disability and wrongful termination violated the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101, *et seq.* ("ADA"); the Rehabilitation Act of 1973, 29 U.S.C. § 791, *et seq.* ("Rehabilitation Act"); the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 626, *et seq.* ("ADEA"); and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* ("Title VII"). Plaintiff also claims that defendants violated her due process rights; she was retaliated against in violation of the District's Worker's Compensation Statute, D.C.Code § 36–1542; and that defendants' actions constituted gross negligence and intentional infliction of emotional distress. Defendants respond, *inter alia,* that plaintiff was not disabled and was terminated, not for any discriminatory reason, but because she was absent from work without leave for an extended period of time. Defendants have moved

for summary judgment on all claims, and for the reasons set forth below, defendants' motion will be granted.

## BACKGROUND

Under Fed.R.Civ.P. 56, a motion for summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits show that there is no genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). To survive summary judgment, the nonmovant must provide evidence that would permit a reasonable jury to find in her favor. *Laningham v. United States Navy,* 813 F.2d 1236, 1241 (D.C.Cir.1987).

█ Local Civil Rule 7.1(h) provides that "[a]n opposition to such a motion shall be accompanied by a separate concise statement of genuine issues setting forth all material facts as to which it is contended there exists a genuine issue necessary to be litigated, which shall include references to the part of the record relied on to support the statement." The parties "are obligated, pursuant to Local Rule [7.1(h)], to identify the material facts and point to evidence of record that supports their respective positions." *United States v. BCCI Holdings (Luxembourg), S.A.,* 977 F.Supp. 1, 6 (D.D.C.1997) (citing *Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner,* 101 F.3d 145, 150–51 (D.C.Cir.1996)). Under Rule 7.1(h), "the court may assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion." In contravention of this explicit mandate, plaintiff has not submitted a Rule 7.1(h) statement, and thus has failed to controvert any of the facts set forth by defendants in their Statement of Material Undisputed Facts [hereinafter Defs.' Statement], including the facts relating to her conduct prior to termination. Given this failure, the facts as set forth by defendants are taken as true and can be summarized briefly as follows.

Plaintiff Melba Heasley, a Caucasian, was born on January 24, 1929, making her 70 years old at the relevant time period. From 1987 to the present, she has been employed full time as a clerical worker at the United States Social Security Administration. From 1988 until her termination on February 26, 2000, plaintiff also worked as a part-time clerical worker at D.C. General Hospital ("D.C.General"), where her schedule required three four-hour shifts per week. After working in various departments in D.C. General, in either 1995 or 1996 plaintiff was transferred to the Medical Records Department where she worked as a medical records technician ("MRT") until her termination. MRTs are responsible for maintaining D.C. General's patient charts and making those charts available to medical personnel. Performance of these functions requires the completion of a variety of tasks, including sorting paperwork generated by the hospital's medical units, filing that paperwork in patient charts, re-shelving the patient charts in the file room stacks, pulling charts from the stacks, delivering charts to locations within and outside D.C. General, and assisting medical personnel with questions regarding records. Plaintiff's supervisor, the file room manager, was Madeleine Freeman, who at the relevant time was 49 years old. Freeman's supervisor was the director of the Medical Records Department, Stephanie Jordan.

In February 1999, plaintiff was assigned more filing, which required more physical exertion than plaintiff's previous duties. The February filing increase was not ac-

companied by any change in plaintiff's job title, hours, schedule or in her salary and benefits. In March 1999, plaintiff complained to Jordan that she suffered from knee and back pain and that these conditions made it difficult for her to do the filing assignments. Plaintiff requested a return to her previous sedentary duties to accommodate her condition. At Jordan's request, plaintiff provided medical documentation regarding her condition by letter dated March 13, 1999. She included a physician's statement dated March 1, 1999, which reflected a diagnosis of "knee pain" and indicated that plaintiff was "unable to tolerate standing at work for extended periods." (Defs.' Statement ¶ 20, Ex. 17.) In April 1999, after a union representative approached Freeman on behalf of plaintiff regarding her complaints, Freeman and Jordan reviewed plaintiff's medical documentation and decided that plaintiff could continue to do filing, but permitted her to "work at her own pace and sit down when she needed to do so." (*Id.* ¶ 22.)

After May 22, 1999, plaintiff stopped coming to work. On May 27, 1999, she filed a complaint with the Equal Employment Opportunity Commission (EEOC) alleging failure to accommodate her disability and race discrimination.[1] On June 9, 1999, plaintiff filed a workers' compensation claim, and the next day she notified Freeman that she had done so. On June 18, plaintiff indicated in a letter to Jordan that she had been denied an accommodation by Freeman and also provided notice of her workers' compensation claim. Jordan responded on June 21, reiterating that plaintiff should return to work at her own pace and take breaks as necessary. On August 18, 1999, a final order was entered

dismissing plaintiff's workers' compensation claim.

Plaintiff had been absent from work on May 17, 20, and 29. To excuse these absences, on June 4, 1999, she provided Freeman a doctor's note dated June 3, 1999. The physician's note diagnosed plaintiff with osteoarthritis of the left knee. (*Id.* ¶ 27, Ex. 21.) Plaintiff did not return to work, however, and in a letter dated July 7, 1999, Jordan requested additional medical documentation for plaintiff's continuing absence past June 3. Plaintiff acknowledged receipt of Jordan's letter, but in response provided only a "Verification of Treatment," which indicated that she had received medical treatment but offered no diagnosis or prognosis regarding her ability to work. (*Id.* ¶¶ 30–31, Ex. 27.) On August 30, 1999, Jordan sent a follow-up letter to plaintiff, informing her that if she did not report to work by September 10 with the appropriate documentation justifying her absence, she would be considered absent without leave. Plaintiff failed to respond before the deadline.

Almost five months after plaintiff stopped coming to work, on October 21, 1999, Jordan sent plaintiff a notice of proposed removal. The notice cited plaintiff's absence without leave and failure to provide appropriate medical documentation. Jordan sent a second notice of proposed removal on November 4, 1999, which again cited plaintiff's absence without leave and the lack of documentation and indicated that plaintiff could contact a "disinterested designee," Ann Anderson, within ten days of receipt of the letter. (*Id.* ¶ 36, Ex. 31.) Plaintiff received this letter and responded with a letter of resignation on November 11, 1999. Almost two weeks later, in a

---

1. On February 25, 2000, plaintiff amended the EEOC complaint to include age discrimi-

nation.

letter dated November 23, plaintiff retracted her resignation. Her letter claimed that the November 4 notice of termination contained "many false statements" and requested an extension of time to seek legal counsel. (*Id.* ¶ 39, Ex. 33.) Plaintiff submitted nothing further and defendants never responded. By letter dated February 22, 2000, plaintiff's employment at D.C. General was terminated effective February 26, 2000.

On May 17, 2000, the EEOC issued plaintiff a right-to-sue letter. On August 16, 2000, plaintiff brought this lawsuit alleging discrimination on the basis of disability, age, and race, violation of due process, and tort claims based on intentional infliction of emotional distress and gross negligence. Plaintiff asks for reinstatement to her position at D.C. General, as well as compensatory and punitive damages.

### *LEGAL ANALYSIS*

### I. Federal Claims

#### A. *Failure to Accommodate*

Plaintiff makes two disability-related claims, the first of which is addressed here, and the second in Part I.B, *infra*. First, she claims that defendants failed to accommodate her disability, and second, that defendants discriminated against her on the basis of her alleged disability. (Plaintiff's Reply to Defendants' Motion for Summary Judgment [hereinafter Pl.'s Opp.] at 9–16.) As to both of these claims, defendants argue that plaintiff cannot establish a prima facie case because she cannot sustain her claim that she was disabled. (Defendants' Memorandum of Points and Authorities in Support of Defendants' Motion for Summary Judgment [hereinafter Defs.' Mem.] at 33–38.)

To establish a prima facie case of failure to accommodate a disability, plaintiff must demonstrate that (1) she has a disability, and (2) with a reasonable accommodation, she could perform the essential functions of her job. *Flemmings v. Howard Univ.*, 198 F.3d 857, 861 (D.C.Cir. 1999). Plaintiff also must be able to specify the reasonable accommodation she seeks. *Id.* Significantly, the ADA does not protect every impaired individual who suffers an adverse employment action; rather, "the ADA more specifically prohibits discrimination by an employer 'against a qualified individual with a disability because of' that disability.... Far from protecting all impaired individuals from any sort of adverse employment action, the ADA protects a much more narrowly defined class of persons from particular types of discriminatory acts by employers." *Id.* at 860 (quoting 42 U.S.C. § 12112(a)).

Without citation to any legal authority, plaintiff asserts that her knee and back conditions rise to the level of a disability within the meaning of the ADA, but with a reasonable accommodation she could still work as an MRT. (Complaint ¶¶ 58, 62; Pl.'s Opp. at 9–16.) Defendants challenge both plaintiff's claim of a disability and her ability to perform the duties of an MRT with or without an accommodation.

The ADA defines "disability" as "a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual." 42 U.S.C. § 12102(2)(A). Determination of a "disability" is a three-step process: plaintiff must demonstrate (1) a physical impairment, (2) which affects a major life activity; and (3) the impairment must substantially limit that activity. *Bragdon v. Abbott*, 524 U.S. 624, 632–42, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998) (holding that respondent's HIV infection was a disability under the ADA). Plaintiff complains of knee and back pain, obviously physical

impairments, and although plaintiff fails to specify the major life activity affected, it is clear from her pleadings that she believes her condition jeopardizes her ability to stand for prolonged periods of time.[2] Because it is not contested, this Court will assume that prolonged standing constitutes a major life activity. *See Taylor v. Pathmark Stores, Inc.*, 177 F.3d 180, 185 (3d Cir.1999) (assuming standing a major life activity when not disputed); *Dupre v. Charter Behavioral Health Systems of Lafayette Inc.*, 242 F.3d 610, 614 n. 3 (5th Cir.2001) (noting in dicta that agency guidance suggests that standing might constitute a major life activity).

▪ However, plaintiff cannot establish that at the relevant time in March 1999 she was substantially limited in her ability to stand. The ADA does not define the term "substantially limits," but courts have followed the EEOC's understanding that substantial limitations "require that an individual be '[u]nable to perform a major life activity that the average person in the general population can perform' or '[s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity' as compared to the average person in the general population." *Siragy v. Georgetown Univ.*, 1999 WL 767831, slip op. at 3 (D.D.C.1999) (quoting 29 C.F.R. § 1630.2(j)(1)(i)-(ii)). Given this standard, it must be concluded, based on the undisputed evidence, that no reasonable jury could find that plaintiff's major life activities were substantially limited in March

1999 when she requested an accommodation.

Plaintiff first brought her medical condition to defendants' attention in March 1999. (Defs.' Statement ¶ 20.) Plaintiff met with Jordan, the department supervisor, discussed her knee pain in relation to her filing assignments, and provided medical documentation in a letter dated March 13, 1999. (*Id.*) Enclosed with the March letter was a doctor's note dated March 1, 1999, that diagnosed her condition only as "knee pain," noting that she was "unable to tolerate standing at work for extended periods." (*Id.* ¶ 20, Ex. 17.) However, this diagnosis of knee pain that only prevented plaintiff from standing for an "extended period" is not legally sufficient to establish a disability. This diagnosis does not establish that plaintiff's condition was not temporary, which would be fatal to a disability claim. *Cf. Paegle v. Department of the Interior*, 813 F.Supp. 61, 64 (D.D.C. 1993) (holding that temporary back injury, although "painful and disabling at the time," was not a handicap for purposes of the Rehabilitation Act), *aff'd*, 24 F.3d 1464, 1994 WL 245607 (D.C.Cir.1994). Furthermore, an inability to stand for an "extended period" has been found not to be a significant restriction. *See, e.g., Dupre v. Charter Behavioral Health Systems of Lafayette Inc.*, 242 F.3d 610, 614 (5th Cir. 2001) (need to "walk or sit for a while" after standing for an hour is not substantial limitation); *Taylor v. Pathmark Stores, Inc.*, 177 F.3d 180, 186 (3d Cir. 1999) (need to take ten minute breaks

---

**2.** Because plaintiff has failed to adduce evidence that her medical condition disqualifies her from working in a substantial number of clerical positions, she cannot claim a limitation on her ability to work under the ADA. *See Duncan v. Washington Metropolitan Area Transit Authority*, 240 F.3d 1110, 1115–16 (D.C.Cir.2001) (holding that to demonstrate substantial limitation of ability to work, the

"ADA requires a plaintiff . . . to produce some evidence of the number and types of jobs in the local employment market in order to show he is disqualified from a substantial class or broad range of such jobs"; plaintiff must be "effectively precluded from working in the class or range" ). In fact, she continues to hold down a full-time clerical position with the federal government.

while standing or walking not a substantial limitation); *Colwell v. Suffolk County Police Dep't*, 158 F.3d 635, 644 (2d Cir.1998) (plaintiff's difficulty standing at attention or in one spot "for any period of time" was not a substantial limitation); *see also Vass v. The Riester & Thesmacher Co.*, 79 F.Supp.2d 853, 860–61 (N.D.Ohio 2000) (plaintiff was not substantially limited by physical impairments including an inability to stand for more than approximately 30 minutes before experiencing discomfort); *Bailey v. Charlotte–Mecklenburg Bd. of Education*, 2001 WL 1019736, slip op. at 8–9 (W.D.N.C.2001) (plaintiff's inability to stand for "prolonged periods of time" without intermittent five or ten minute breaks did not rise to the level of a disability).

 However, plaintiff claims that defendants were or should have been aware of her alleged disability during the relevant time period. (Pl.'s Opp. at 11–13.) Plaintiff offers a number of medical reports that diagnose her as having "mild degenerative joint disease (osteoarthritis of the knees)" (Pl.'s Opp, Ex. 20, June 23, 1999 Report of Dr. Henry R. Herbert), or a "probable torn medial meniscus." (Pl.'s Opp., Ex. 20, July 23, 1999 Report of Doctor James J. Graetner.) The proffered diagnosis regarding her lower back is less precise, indicating that she "reports symptoms of a lumbar syndrome." (*Id.*) While it may be arguable that degenerative osteoarthritis would qualify as a disability, which impairs one's ability to stand, walk, and work, *see, e.g., Koshinski v. Decatur Foundry, Inc.*, 177 F.3d 599, 602 (7th Cir. 1999) (considering work capacity of individual with degenerative osteoarthritis);

*Beck v. University of Wisconsin Bd. of Regents*, 75 F.3d 1130, 1136 (7th Cir.1996) (considering measures to accommodate osteoarthritis arising from repetitive keyboarding), none of this evidence was presented to defendants when they made their decision regarding plaintiff's requested accommodation.[3] To receive ADA protection, a disability must be demonstrated at the time plaintiff requested and was refused a reasonable accommodation. *See Flemmings*, 198 F.3d at 861 (holding that no accommodation necessary prior to substantiation of need by medical documentation consisting of a letter diagnosing plaintiff with "vertigo and migraine headaches exacerbated by work related stress" and recommending leave of absence). Here, when plaintiff first spoke with Jordan, she provided limited documentation of "knee pain" only, which did not significantly restrict her ability to stand and work, and which therefore did not need to be accommodated. It was not until after plaintiff stopped coming to work in May 1999 that defendants first received the doctor's note diagnosing plaintiff's condition as osteoarthritis. (Defs.' Statement ¶ 27.) Plaintiff therefore cannot carry her "burden of establishing with medical evidence the existence of the alleged disability, and presenting the documentation during the term of employment, not following termination." *Weigert v. Georgetown Univ.*, 120 F.Supp.2d 1, 7 (D.D.C.2000) (internal quotation marks omitted).

 Moreover, without sufficient notice of a qualifying disability, defendants were under no obligation to provide an accom-

---

**3.** Significantly, with the exception of the March 1, 1999 doctor's note (Defs.' Statement ¶ 20, Ex. 17), none of the medical records that plaintiff now relies on to establish her disability was provided to defendants before plaintiff stopped coming to work in May 1999. (Pl.'s Opp., Ex. 20.) Moreover, a careful review of

these records indicates that as of February 1999, plaintiff walked extensively on a tour through England "without significant pain or mechanical symptoms," and that any alleged disability was not medically documented prior to June 1999. (*Id.*, Kaiser Permanente Pace System Report at 2.)

modation, and, as established by Defs.' Statement ¶ 22, which plaintiff has failed to contest,[4] Jordan did in fact accommodate plaintiff by allowing her to work at her own pace and to sit down when she needed to do so. Given the medical documentation available to defendants, this accommodation would have been entirely reasonable. *See Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278 (11th Cir.1997) (offering multiple break options sufficient accommodation of plaintiff's inability to stand for prolonged periods of time).

For these reasons, plaintiff cannot sustain her claim of a disability claim, and thus her ADA claims must be dismissed.

### B. Discrimination Claims

Plaintiff alleges that defendants took a number of adverse actions against her on the basis of her disability, age, and race. Because plaintiff has not adduced direct evidence of discriminatory intent and defendants deny that their actions were motivated by any discriminatory animus, the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), governs the analysis of plaintiff's discrimination claims. *See Brown v. Brody*, 199 F.3d 446 (D.C.Cir.1999) (applying *McDonnell Douglas* test to Title VII claim); *Hall v. Giant Food, Inc.*, 175 F.3d 1074, 1077 (D.C.Cir. 1999) (applying *McDonnell Douglas* test to ADEA claim); *Duncan*, 240 F.3d at 1114 (applying *McDonnell Douglas* test to ADA

claim).[5] Under the *McDonnell Douglas* framework, the plaintiff must first establish a prima facie case. *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

■ To establish her prima facie case of disability, age, or race discrimination, plaintiff must establish, *inter alia*, that her employer took an adverse employment action against her because of her protected status. *See Duncan*, 240 F.3d at 1114; *Hall*, 175 F.3d at 1077; *Brown*, 199 F.3d at 452.[6] Plaintiff asserts three allegedly discriminatory actions: (1) defendants changed her duties to include more filing (Complaint ¶¶ 10, 14, 23, 26, and 53); (2) a fellow employee ridiculed her and accused her of submitting an invalid sick-leave slip (Complaint ¶¶ 25, 27–28); and (3) her employment was terminated. (Complaint ¶¶ 39, 46, 55, 60, and 66.) Defendants argue that, with the exception of plaintiff's termination, these actions do not constitute adverse employment actions, and as for plaintiff's termination, this was the result of her being absent without leave, not as a pretext for any discriminatory animus.

■ Neither the change in plaintiff's duties nor the alleged ridicule from a fellow employee rises to the level of an adverse employment action, for neither had "materially adverse consequences affecting the terms, conditions, or privileges of [plaintiff's] employment." *Brown*, 199

---

4. In plaintiff's deposition, she appears to dispute this assertion. (*See, e.g.*, Pl.'s Opp., Ex. 33.) Even if one were to assume that there is a factual dispute as to this issue, plaintiff's disability claim would still fail because of the lack of evidence of a disability.

5. In this Circuit, failure to accommodate claims are not analyzed under the *McDonnell Douglas* formula, but have their own "specialized legal standards." *Aka v. Washington*

*Hospital Center*, 156 F.3d 1284, 1288 (D.C.Cir.1998).

6. In addition, to establish a prima facie case for disability discrimination under the ADA, plaintiff must establish that she was disabled, *see Duncan*, 240 F.3d at 1114, which as explained in Part I.A, *supra*, she is unable to do. So for this reason as well, any claim of disability discrimination must be dismissed.

F.3d at 457. The action must inflict an "objectively tangible harm." *Russell v. Principi,* 257 F.3d 815, 818 (D.C.Cir.2001) (internal quotation marks omitted). As for plaintiff's increased filing responsibilities, "changes in assignments or work-related duties do not ordinarily constitute adverse employment decisions if unaccompanied by a decrease in salary or work hour changes. An employer has discretion to assign work to equally qualified employees so long as 'the decision is not based upon unlawful criteria.'" *Mungin v. Katten Muchin & Zavis,* 116 F.3d 1549, 1557 (D.C.Cir.1997) (citations omitted). It is not disputed that there was no change in the title or location of plaintiff's position, a reduction in her pay or benefits, any change in her work hours, or any loss of responsibility. (Defs.' Statement ¶ 18.) Furthermore, it is not disputed that the MRT position always involved some amount of filing. (*Id.* ¶¶ 10–11.) Plaintiff simply was assigned more of it.

Plaintiff's only response is that the increase in filing responsibilities was actually a "reassignment to a different position." (Pl.'s Opp. at 16.) However, the undisputed facts prove otherwise. Since sometime in 1995, plaintiff worked in the Medical Records Department, where she claims her duties involved "sorting and putting in order files and papers as well as some computer entry." (*Id.* at 10.) In the summer of 1998, plaintiff's main responsibility was to answer the phone. (Defs.' Statement ¶ 12.) In February 1999, plaintiff's job consisted primarily of filing. (*Id.* ¶ 15.) Significantly, plaintiff does not dispute that all of these tasks were performed by MRTs in the file room, and that she had performed all of them at some time. (*Id.* ¶¶ 8–11.) If plaintiff had been reassigned to a different position, it was in 1995 when she was assigned to the medical records office. After that time, any relatively minor "changes in assignments or work-relat-

ed duties" could not constitute adverse employment actions. *Mungin,* 116 F.3d at 1557.

Neither was the criticism by her co-worker serious enough to affect the terms or conditions of her employment. Generally, co-workers' unpleasant remarks and criticism do not constitute adverse employment actions unless a plaintiff can demonstrate some effect on her employment status. *See Colbert v. Chao,* 2001 WL 710114, *11 (D.D.C.2001) ("disparaging comments" were not an adverse personnel action where plaintiff failed to show that her employment status was affected); *Glovinsky v. Cohen,* 983 F.Supp. 1 (D.D.C. 1997) (supervisor's pointed criticism did not constitute adverse employment action where no personnel action was taken). Here, plaintiff did not report the incidents to her employers and has alleged no material change in the terms and conditions of her employment arising from the two remarks.

In contrast, plaintiff's termination clearly constitutes an adverse employment action. However, even if plaintiff could make out the other elements of her prima facie case, which she cannot, defendants have offered a legitimate non-discriminatory reason for firing plaintiff—her extended absence without leave. When an employer asserts that it took an employment action "for reasons unrelated to the person's handicap," the claim "involves the sort of inquiry into subjective facts"—the employer's true motivation—that the *McDonnell Douglas* three-step approach was designed to address. *Barth v. Gelb,* 2 F.3d 1180, 1186 (D.C.Cir.1993). Once the plaintiff has established a prima facie case, "[t]he burden then shifts to the defendant to rebut the presumption of discrimination by proffering a legitimate, non-discriminatory reason for the adverse employment ac-

tion." *Kidane v. Northwest Airlines, Inc.*, 41 F.Supp.2d 12, 17 (D.D.C.1999); *Hall*, 175 F.3d at 1077 (holding that under the ADEA, if plaintiff succeeds in establishing her prima facie case, the burden then " 'shifts to the employer to articulate legitimate, nondiscriminatory reasons for the challenged employment decision' ") (quoting *Aka*, 156 F.3d at 1288).

Plaintiff stopped coming to work at the end of May 1999 and did not return before she was fired on February 26, 1999. (Defs.' Statement ¶ 25.) Plaintiff's supervisor requested medical documentation to justify those absences after June 3, 1999, and she submitted an inadequate response. (*Id.* ¶¶ 30–31.) Plaintiff's medical documentation verified only that she had been treated; it provided no medical diagnosis and no information regarding her ability to resume her job duties. (*Id.* ¶ 31.) Despite repeated requests, plaintiff failed to provide follow-up or supplemental documentation. On August 30, 1999, defendants mailed a letter to inform plaintiff that her medical documentation was inadequate and that she had until September 10, 1999 to rectify the situation. (*Id.* ¶ 34.) The letter informed plaintiff that if she failed to report to work by September 10 with documentation explaining her absence, she would be considered absent without leave. (*Id.*) Plaintiff failed to respond. On October 21 and again on November 4, 1999, defendants sent plaintiff proposed notices of removal, the second of which provided ten days to respond. (*Id.* ¶¶ 35–36.) In response to the second notice, plaintiff offered a letter of resignation, subsequently withdrew that letter, and on November 23, 1999, requested an extension of time to respond to the "many false statements" in the November 4 notice. (*Id.* ¶¶ 37, 39.) On January 11, 2000, plaintiff indicated that she had not received a response to her request for more time, but submitted

no additional documentation justifying her extended absence.

In sum, given ample notice and opportunity to provide documentation for her extended and unexcused absence, plaintiff did next to nothing, providing admittedly inadequate substantiation of her medical excuse. Thus, her termination is clearly chargeable to her extended absence without leave, and "the presumption of discrimination raised by the prima facie showing is rebutted and 'drops from the case.' " *Hall*, 175 F.3d at 1078 (quoting *Burdine*, 450 U.S. at 255 n. 10, 101 S.Ct. 1089).

Given defendants' showing of a legitimate, nondiscriminatory basis for plaintiff's termination, plaintiff must show that defendants' reason is mere pretext for discrimination. *See Kidane*, 41 F.Supp.2d at 17. In an effort to satisfy this burden, plaintiff maintains that appointment of Anne Anderson as the disinterested designee on her case demonstrates that something "fishy" was going on because Anderson had previously "lost" a grievance claim filed by plaintiff and was "biased." (Pl.'s Opp. at 17, 18.) Additionally, plaintiff claims that the credibility of Freeman "is highly suspect and her reasoning in allegedly overlooking Plaintiff's poor performance is not persuasive and in fact run [sic] afoul of the regulations and policies of Defendants." (*Id.* at 18.) Finally, plaintiff notes that Anderson and Freeman failed to notify plaintiff's union representative of her termination. (*Id.*) Even accepting these allegations as true, they provide no evidence that defendants' reason for plaintiff's termination was pretextual, as opposed to her admitted failure to show up for work from May 1999 until she was terminated in February 2000. *See, e.g., Sanchez v. Henderson*, 188 F.3d 740, 745–48 (7th Cir.1999) (termination of plaintiff's employment on the basis of failure to provide adequate documentation for eight

month absence without leave was not pretext for discrimination or retaliation).

Because plaintiff has not " 'discredit[ed] the employer's explanation,' *Aka*, 156 F.3d at 1288, by demonstrating that the proffered reasons are a mere pretext for discrimination," *Hall*, 175 F.3d at 1078, no reasonable jury could find that plaintiff was terminated because of any disability, her age, or her race, as opposed to her being absent without leave. Thus, plaintiff has not met her "ultimate burden of persuading the court that she has been the victim of intentional discrimination," and summary judgment must be granted as to her discrimination claims. *Burdine*, 450 U.S. at 256, 101 S.Ct. 1089.

■■■■ Additionally, with respect to the race discrimination claim, even if plaintiff could surmount the aforementioned difficulties, because plaintiff is not a member of a protected class, she must present evidence of " 'background circumstances [that] support the suspicion that the defendant is the unusual employer that discriminates against the majority.' " *Harding v. Gray*, 9 F.3d 150, 153 (D.C.Cir.1993) (citation omitted). Plaintiff can satisfy this burden with evidence that defendants had a reason or inclination to discriminate invidiously against whites, or with "evidence indicating that there is something 'fishy' about the facts of the case at hand that raises an inference of [reverse] discrimination." *Id.* Regarding the likelihood of reverse discrimination, plaintiff's evidence of "background circumstances" is plainly insufficient. In an affidavit attached to plaintiff's opposition, Amicia Renee Jackson, a co-worker from D.C. General, claims that "scanning" D.C. General's personnel records will reveal a disproportionately high number of African Americans in plaintiff's staff position and in management positions above her. (Pl.'s Opp., Ex. 2.) However, Ms. Jackson's conclusory statements provide little, if any, evidence to establish a pattern of reverse discrimination, and they fail to provide any reason as to why defendants would have discriminated against plaintiff in the final months of her eleven-year tenure at D.C. General.

Finally, even if construed as a disparate treatment claim, plaintiff's discrimination claims fail for an additional reason. In order to demonstrate a prima facie case of disparate treatment, plaintiff must show (1) that defendants treated African–American or younger MRTs differently than white or older MRTs, and (2) that the African–Americans or younger individuals who received different treatment were similarly situated to plaintiff. *See Batson v. Powell*, 21 F.Supp.2d 56, 58 (D.D.C. 1998) (setting forth test in context of Title VII gender discrimination claim); *Kidane*, 41 F.Supp.2d at 17 n. 8 ("In order to prove disparate treatment, plaintiff must produce evidence which establishes that for the same conduct [s]he was treated differently than similarly situated employees outside [her] protected class."); *McGill v. Munoz*, 203 F.3d 843, 848 (D.C.Cir.2000) (failure to adduce evidence of disparate treatment required judgment as a matter of law against plaintiff's discrimination claim).

■■■■ To establish that non-white or younger MRTs were treated differently, plaintiff again relies on the affidavit of Arnicia Renee Jackson, which she claims demonstrates that D.C. General "had a reputation for discriminating against the majority." (Pl.'s Opp. at 19.) However, plaintiff fails to demonstrate that any employees who may have received different treatment were in fact similarly situated. To show that a employee is similarly situated, "[a] plaintiff must ... demonstrate that all of the relevant aspects of her employment situation were nearly identical to those" of the employee being compared. *Holbrook v. Reno*, 196 F.3d 255, 261

(D.C.Cir.1999) (internal quotation marks omitted); *see also Mungin,* 116 F.3d at 1554–55; *Phillips v. Holladay Property Servs.,* 937 F.Supp. 32, 37 (D.D.C.1996) (to be similarly situated, an employee "must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it."), *aff'd without op.,* 1997 WL 411695 (D.C.Cir. June 19, 1997) (citation omitted). Regarding the issue of medical accommodations, the Jackson affidavit refers to "numerous times that employees were so accommodated," but cites only two accommodation cases involving African–Americans. (Pl.'s Opp, Ex. 2.) Jackson refers to an unidentified nurse, who could not be similar to plaintiff given the difference in jobs, and Eon Johnson, who is alleged to have worked in medical records and suffered severe disabilities, but no other facts regarding the circumstances of his employment or the details of his specific accommodation are provided. Because plaintiff has not presented sufficient evidence to demonstrate that either the unidentified nurse or Mr. Johnson was "similarly situated," she has not made out a claim of disparate treatment.

In conclusion, because no reasonable jury could find that defendants discriminated against plaintiff on the basis of disability, age, or race, summary judgment will be granted with respect to Counts I, II, and III.

### C. Due Process

 Plaintiff apparently complains that her procedural due process rights were violated when defendants terminated her employment without informing her that she had been considered absent without leave. (Complaint ¶¶ 79–80.) To decide whether an individual has been deprived of her right to procedural due process, this Court must consider (1) whether the individual possessed a protected interest such that due process protections adhere, and (2) whether the individual was afforded an appropriate level of process. *Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 428, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982). Even if plaintiff's interest in her employment was a property interest accorded due process protection, plaintiff provides no facts upon which to base a claim of insufficient process. On the contrary, it is undisputed that plaintiff was given numerous opportunities to justify her extended leave, but simply failed to respond. In no way can defendants' decision to terminate her employment be considered arbitrary or otherwise oppressive. Thus, Count VII of plaintiff's complaint must be dismissed.

## II. State Claims

### A. Workers' Compensation Retaliation

 The fourth count of plaintiff's complaint alleges that defendants retaliated against her for filing a workers' compensation claim in violation of D.C.Code § 32–1542. However, that provision does not apply to employees of the District of Columbia. Section 32–1542 prohibits employers and their agents from discharging employees for pursuing workers' compensation claims, but the statute excludes from coverage employees of the federal and District governments. D.C.Code § 32–1501(9). More specifically, for the purposes of Section 32–1542, the term "employee" is defined to exclude "employee[s] subject to the provisions of subchapter XXIII of Chapter 6 of Title 1." D.C.Code § 32–1501(9)(B). (Subchapter XXIII of Chapter 6 of Title 1 establishes a workers' compensation scheme for employees of the District of Columbia, *see gener-*

*ally* D.C.Code § 1–623.01 *et seq.,* covering every employee of "any branch of the District of Columbia government, including ... employee[s] of an instrumentality wholly owned" by the District. D.C.Code § 1–623.01.)

Plaintiff does not dispute that this provision applies and that she is an employee of the District. Rather, plaintiff merely asserts without any legal support that a "close reading" of the statute demonstrates that a District employee is not barred from its protections. (Pl.'s Opp. at 24–25.) As discussed above, this is plainly incorrect. Section 32–1542 does not apply, and Count IV must be dismissed.

### B. Intentional Infliction of Emotional Distress and Gross Negligence

 Defendants raise a number of procedural bars to plaintiff's common-law claims, which this Court need not reach because the claims fail as a matter of law. To state a claim for intentional infliction of mental distress, plaintiff must establish, *inter alia,* that defendants engaged in extreme or outrageous behavior. *See Crowley v. North American Telecommunications,* 691 A.2d 1169, 1171 (D.C.1997). Defendants behavior must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." *Bernstein v. Fernandez,* 649 A.2d 1064, 1075 (D.C.1991) (internal quotation marks omitted). This is a demanding standard, *id.,* and the conduct plaintiff alleges, failure to accommodate, unpleasant remarks by co-workers, and a justifiable termination, simply does not rise to this level. *See, e.g., Underwood v. Archer Management Services, Inc.,* 857 F.Supp. 96 (D.D.C.1994) (termination is by itself insufficient to support a claim for intentional infliction of emotional distress);

*Duncan v. Children's National Medical Center,* 702 A.2d 207, 211–12 (D.C.1997) (noting that "generally, employer-employee conflicts do not rise to the level of outrageous conduct"). Plaintiff's claim of gross negligence is similarly non-meritorious. Plaintiff neither alleges in her complaint nor presents evidence of any negligent conduct, as opposed to intentional conduct, and there is no basis for any jury to infer that defendant's conduct constituted a breach of any standard of care.

For these reasons, Counts V and VI will be dismissed.

### C. Punitive Damages

 Under District of Columbia law, punitive damages are unavailable against the District absent "extraordinary circumstances." *Butera v. District of Columbia,* 235 F.3d 637, 658 (D.C.Cir.2001). The term "extraordinary circumstances" refers to "circumstances such as 'where a jurisdiction's taxpayers are directly responsible for perpetrating the policies that caused the plaintiff's injuries' or 'where a municipality or its policymakers have intentionally adopted the unconstitutional policy that caused the damages in question.'" *Id.* (quoting *Daskalea v. District of Columbia,* 227 F.3d 433, 447 (D.C.Cir. 2000)). Plaintiff has made no such showing here; thus Count VIII of her complaint is also dismissed.

### CONCLUSION

For all of the above reasons, Defendants' Motion for Summary Judgment is granted.